COMMONWEALTH *vs.* GEORGE O. EDGERLY.

Middlesex.    November 14, 1977. — April 19, 1978.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Practice, Criminal,* Voir dire, Comment by prosecutor, Attendance of witnesses, Argument by counsel, New trial, Disqualification of judge, Comment by judge. *Evidence,* Other offense, Cross-examination. *Larceny. False Pretenses.*

At a criminal trial the judge did not abuse his discretion in holding a voir dire to determine whether a prosecution witness who had been granted immunity pursuant to G. L. c. 233, §§ 20C-20I, had been threatened and intimidated by the prosecutor. [248]

There was no merit to the defendant's contention that the judge improperly limited the testimony of a witness in the presence of the jury by consistently excluding matters which had been brought forth during a voir dire, where the judge excluded only hearsay statements and cumulative or redundant testimony. [248]

At a criminal trial the judge did not usurp the function of the jury by stating that as a "matter of fact" certain remarks by the prosecutor to a witness did not constitute unlawful intimidation where it appeared that the judge instructed the jury as a matter of law and where he did not withdraw from the jury the issue of the witness's bias and credibility. [248–249]

At the trial of an indictment charging the defendant with larceny from the General Motors Corporation by submitting false warranty claims, testimony by a witness that he and the defendant had been drinking in Lowell with a field representative from General Motors, that the three then drove to an undisclosed location in Danvers where all three got out of the automobile, and that only the witness and the defendant returned to Lowell, did not improperly inform the jury that the field representative had been murdered and that the defendant had been indicted for the murder. [249–251]

At the trial of a defendant arrested in 1975 for larceny from the General Motors Corporation by submitting false claims for warranty repairs, testimony that the defendant had been arrested in 1974 for another crime did not prejudice the defendant by permitting the jury to conclude that the arrest was tied in with the murder of a General Motors field representative, where the question regarding the crime for which the defendant had been arrested in 1974 was excluded and where there was no mention of murder before the jury. [251]

At the trial of an indictment charging larceny from the General Motors Corporation by submitting false claims for warranty repairs, evidence regarding an alleged larceny by the same means from the manufacturer of Toyota automobiles was relevant to the defendant's intent to steal from General Motors, where the defendant was the director of service of a dual dealership selling Chevrolet and Toyota automobiles from the same premises and his earnings came in part from a percentage of the warranty claims credited to the dealership by Toyota. [251–252]

Although the judge at a larceny trial should have allowed the defendant to cross-examine a witness on the basis of an allegedly contradictory statement she had made at a deposition in a related civil action, in which an order had been entered impounding the transcript of the deposition, his failure to do so did not constitute reversible error in the circumstances. [253–254]

At a larceny trial, the judge did not abuse his discretion in denying a motion to require the attendance of out-of-State witnesses made on the day the jury were to be empanelled and renewed after three weeks of trial, where the defendant made no showing that the testimony of the witnesses he sought to summon would be material to his case. [254–256]

At the trial of a larceny indictment, a single error in the judge's comments during defense counsel's closing argument was not harmful where it was apparent that the judge was acting as a neutral moderator in ruling on the prosecution's numerous objections to defense counsel's argument and where the judge reminded the jury of their duty to decide the case on the evidence and not to allow extraneous factors to interfere with their verdict. [256–258]

Although the remarks of the prosecutor at a larceny trial during his closing argument were not confined throughout to the permissible bounds of proper argument, they were not so prejudicial as to justify reversal when viewed in the overall context of the trial, including the strong curative instructions given by the judge. [258–260]

At the trial of an indictment charging larceny from the General Motors Corporation by false pretenses, the judge did not err in refusing to give an instruction requested by the defendant that if an agent of General Motors had apparent authority to bind his principal and the defendant believed that he did, evidence of such authority could be considered probative of the defendant's state of mind and lack of criminal intent. [260–261]

At the trial of an indictment charging larceny by false pretenses, the judge did not substitute a lower standard of reliance than that required by instructing the jury that it must be proved that the person to whom false representations were made "did, in fact, rely to some extent on the truth of the representations," where he added that the victim's parting with his property must come "as a result of" his reliance. [261–264]

The mere fact that during a larceny trial the judge had written a letter to the Board of Bar Overseers reporting the conduct of defense counsel in attempting to use certain impounded depositions did not require the judge to disqualify himself from imposing sentence on the defendant. [264]

There was no reversible error at a larceny trial in a reference by the judge to "some appellate procedure" made in the course of a discussion carried on in the presence of the jury but not directed to them. [264–265]

There was no merit to the defendant's contention that at the trial of a larceny indictment the judge improperly attributed delay to the defendant when he suspended a session telling the jury that this would allow defense counsel time to inspect a large number of documents in the custody of the prosecutor. [265–266]

INDICTMENT found and returned in the Superior Court on February 20, 1975.

The case was tried before Chmielinski, J.

*P. J. Piscitelli (Elaine M. Epstein* with him) for the defendant.

*James W. Sahakian,* Assistant District Attorney, for the Commonwealth.

HALE, C.J. The defendant was tried before a sequestered jury on an indictment charging larceny by false pretenses of more than one hundred dollars from the Chevrolet Motor Division of the General Motors Corporation (G.M.). He was found guilty and sentenced. The trial was subject to G. L. c. 278, § § 33A–33G. Initially we shall relate briefly facts which could have been found by the jury, and we shall then provide such further details as are necessary to discussion of the defendant's various assignments of error.

During the time period covered by the indictment, March 1, 1969, through February 19, 1975, Edgerly was employed as the director of service at Butler Chevrolet, Inc. (Butler), in Lowell. As such he was responsible for signing warranty claims (form 970) and submitting them to G.M.[1] Each mechanic who performed the work for which a credit was claimed was paid a percentage of the amount of those repairs. Supervisory employees (including Edgerly) were given, in addition to their salaries, a

---

[1] Under regular warranty procedures a customer would bring an eligible vehicle to a dealer and complain of certain problems to a service writer. The service writer would prepare three "soft" copies and one "hard" copy of a repair order. The customer would then sign the repair order. The hard copy would be given to a mechanic who would locate the problem, obtain the necessary parts from the parts department, and repair the vehicle. G.M. would pay the dealer, based on the parts used and the labor involved. In order to be paid for warranty work, a dealer would submit a 970 warranty claim form, based on the repair order, to G.M. The 970 form would be processed by a computer and rejected if improperly filled out. The computer also kept information relating to the vehicle identification number, the equipment on the car and previous warranty repairs performed on that car. If the computer accepted the 970 form, a credit memorandum based on the form would be issued to the dealer. That memorandum was a credit to the dealer towards parts purchased from G.M. If the total of the credits exceeded the total cost of parts purchased, the dealer would be paid the difference in cash.

percentage of the total amount of warranty claims for each month.

In addition to the genuine warranty claims he submitted, the defendant prepared and submitted 970 forms in connection with cars brought in for service for work which was never done and for parts which were never used. This procedure was known as "hitting the tickets" with an "add on." Warranty repair claims were also submitted on cars which had not been brought in for service.

The defendant was active in this scheme and took certain actions to ensure that it would go undetected. He kept records to make certain that vehicles were not the subject of the same false warranty claim more than once. He directed the mechanics as to the types of repairs to claim in order to avoid the same kinds of repair being claimed too often. He made payments and gave gifts to G.M. representatives to ensure the continuation of the scheme without interference by G.M. When two field representatives from G.M. asked too many questions and supervised the mechanics too closely, the defendant staged a walkout of the mechanics, instructing them to complain that they felt they were being interfered with in their work by the constant presence of G.M. personnel.

Edgerly based his defense principally on his lack of criminal intent to defraud G.M. His cross-examination of witnesses was directed mainly toward showing that during the period covered by the indictment it was common practice in the industry for service writers to inflate repair orders for work not actually performed on automobiles or for parts not actually used and that during that period employees of G.M. were aware of the warranty padding and not only condoned it but encouraged an arrangement between G.M. and Butler whereby Butler was allowed to pad its warranty claims in exchange for which (among other things) it would market undesirable used cars and "production line mistakes," which are cars difficult to sell because of their color combinations. The theory of the defense was that, if the jury believed such

testimony, they would find that the defendant had formed a belief that his actions were not criminal because G.M. had participated in and condoned them and the jury would conclude that the defendant lacked the intent to steal required for a conviction.

At the outset we note that the trial lasted twenty days and that the transcript fills twenty-eight volumes. The defendant has made thirty-three assignments of error and has argued twenty-two of them. Neither at trial nor on appeal has defense counsel left unturned any stone which he could possibly move. While we do not fault aggressive representation, we do caution against argument of frivolous or contrived issues. In the course of a hard fought trial such as this, many small errors will occur. Those errors do not call for reversal if it is clear that they in no way affected the outcome of the trial. It has been said that "[a] defendant is entitled to a fair trial, but not a perfect one." *Lutwak* v. *United States*, 344 U.S. 604, 619 (1952). Our review of the entire record has convinced us that the defendant did receive a fair trial consistent with the standards set out in the United States Constitution and the Massachusetts Declaration of Rights. For the reasons outlined in this opinion we affirm the defendant's conviction.

We turn now to our consideration of those assignments of error (G. L. c. 278, § 33D) which are grounded on exceptions (*Commonwealth* v. *Hall*, 369 Mass. 715, 717 [1976]), which have been argued (Rule 1:13 of the Appeals Court, as amended effective February 27, 1975, 3 Mass. App. Ct. 801), and which merit discussion.

*The Witness Donald Tremblay*

A voir dire was held for the purpose of determining whether Donald Tremblay, a prosecution witness who had been granted immunity pursuant to G. L. c. 233, §§ 20C–20I, had been threatened and intimidated by the prosecutor. Tremblay was the office manager and "controller" of Butler during much of the time relevant to the indictment. At trial he proved to be a recalcitrant wit-

ness. Under cross-examination he gave testimony favorable to the defendant in several respects. The next day under redirect examination by the prosecutor, Tremblay became evasive and forgetful and was declared a hostile witness. On recross-examination defense counsel asked Tremblay whether he had consulted at length with the prosecutor regarding his testimony. Instead of responding, Tremblay asked to speak with his attorney and was allowed to do so. When the trial resumed the prosecutor requested a voir dire. At the voir dire it was adduced that the witness felt threatened and intimidated by certain remarks made by the prosecutor.[2] At the close of the voir dire the judge stated that he found no intimidation and no pressure, that the prosecutor's statements were an "admonition to speak the truth and that if the witness were indeed not telling the truth, ... [the prosecutor] would present the matter before the grand jury."[3] The defendant excepted to that ruling.

When Tremblay resumed the stand in the presence of the jury he testified to the same effect as on voir dire. At one point in his testimony the judge interrupted the questioning and informed the jury that there had been an extended voir dire hearing on the question of intimidation and that "the court has determined as a matter of fact that the conversation between the district attorney and the witness was to the effect that the district attorney told him that if he was not telling the truth, or converse-

---

[2] Tremblay testified that when he and the prosecutor had met over the weekend prior to his testimony, the prosecutor had opened the meeting with the remark, "If you blow this case for me, you're going to be in trouble." He also testified that after he had been cross-examined by defense counsel, at which time the evidence favorable to the defendant had been adduced, the prosecutor had said, "If you're lying, I'm going to take you before the next session of the grand jury."

[3] The judge also filed a memorandum in which he found that, taken in the context of the reluctance with which Tremblay was testifying and the pressure he might be under to change his testimony, the prosecutor's remark was a "poorly phrased but perfectly proper reminder to the witness to tell the truth."

ly, if he was lying, that he would be faced with possible grand jury action for perjury. Subjectively, the witness took this as a threat or an intimidation; but the court has determined that the action of the district attorney in informing him if he was not telling the truth, that he'd be liable for perjury, in no way constituted a threat or intimidation." The defendant excepted to that statement and continued with his examination.

The defendant argues (1) that the judge abused his discretion in granting a voir dire on the issue of Tremblay's testimony, (2) that the judge improperly curtailed cross-examination of the witness before the jury by excluding a line of questioning, and (3) that the judge usurped the function of the jury by "ruling" as a "matter of fact" that the witness had not been intimidated. We discuss those arguments seriatim.

1. The judge acted within his discretion in granting the voir dire. See *Commonwealth* v. *Douglas*, 354 Mass. 212, 225 (1968), cert. denied, 394 U.S. 960 (1969); *Commonwealth* v. *Kelly*, 1 Mass. App. Ct. 441, 445 (1973).

2. We have reviewed the transcripts of Tremblay's testimony on voir dire and in the presence of the jury, and we do not find any material difference. Tremblay was permitted to tell the jury what the prosecutor had said to him and that he had felt threatened by it. The judge excluded only hearsay statements and cumulative or redundant testimony. See *Commonwealth* v. *Smith*, 329 Mass. 477, 479 (1952); *Commonwealth* v. *Underwood*, 358 Mass. 506, 513 (1970); *Commonwealth* v. *Turner*, 371 Mass. 803, 811 (1977).

3. The judge did not usurp the function of the jury in making the ruling which is being challenged. Questions of law are for the court. G. L. c. 278, § 11. The legality of the prosecutor's conduct was a question of law. The judge did not instruct the jury that they were not to consider the evidence they heard. To the contrary, he told them that the words of the prosecutor might well have had the effect on Tremblay which the witness and the defendant

were claiming. He did not withdraw from the jury the critical issue of Tremblay's credibility, contrast *Commonwealth* v. *McCauley*, 355 Mass. 554, 560 (1969), nor did he tell them that the witness did not feel intimidated. He merely told the jury that the prosecutor's conduct did not constitute unlawful intimidation. While we consider it probable that the judge intended to use the word "law" rather than the word "fact," in the circumstances it was not improper for him to state his preliminary finding of fact to the jury. Cf. *Commonwealth* v. *White*, 353 Mass. 409, 418 (1967), cert. denied, 391 U.S. 968 (1968); *Commonwealth* v. *Polidoro*, 4 Mass. App. Ct. 794 (1976).

On the day after Tremblay completed his testimony the judge spoke to the jury regarding the weight they might choose to place on Tremblay's testimony. He said that "the testimony is relevant as to the possible bias of the witness. You may accept or reject any or all of yesterday's testimony. It is up to you as judges of the facts to weigh the evidence and determine whether or not, and to which side this witness is biased. Very simply, I'm telling you that the mere warning of a perjury indictment should not create a misimpression that something unlawful was done." In addition, in his charge the judge again instructed the jury that it was their duty to "determine the facts and make a decision . . . This is your province and your province entirely. It is not mine . . . and any comment I make in reference to the evidence is not binding upon you, because it's your memory that governs and certainly not mine . . . ." It thus becomes clear that the judge instructed the jury on a matter of law and left to them the issues of bias and credibility. There was no error which requires reversal.

*Evidence of Other Crimes*

1. The defendant has raised in various ways through several assignments of error his contention that evidence of his involvement in other criminal activity should not have been allowed to come before the jury. First, he asserts prejudicial error in what he claims was the admis-

sion in evidence of testimony concerning Edgerly's involvement in a murder. At the time of the instant trial the defendant was awaiting trial on an indictment charging him with the murder of one Frank Smith, a field representative from G.M. who was investigating the warranty repair procedure at Butler. Although that fact was very much in the minds of both counsel, and evidence was given on voir dire concerning the alleged murder, the jury, who were sequestered throughout the trial, were never apprised of the indictment. Although the judge ruled at the conclusion of a voir dire that evidence of the alleged murder would be admissible on the issues of the defendant's motive and intent to defraud, the prosecutor chose not to introduce such evidence before the jury. Therefore, we are not required to consider the correctness of the judge's ruling.[4] The defendant argues that the jury were informed of the alleged murder. He points to the testimony of one James Dolson (an assistant to Edgerly in filling out warranty forms) who, prior to the alleged murder, had been drinking in a bar in Lowell with Edgerly. Dolson, who had testified on voir dire that he saw Edgerly shoot Smith, told the jury (by way of affirmative responses to the prosecutor's questions) that the three had left Lowell in an automobile and that, at some undescribed location in Danvers, three had gotten out of the

---

[4] While it is ordinarily true in this Commonwealth that evidence that a defendant has committed another crime cannot be used to show that he committed the crime for which he is being tried, *Commonwealth* v. *Nichols*, 4 Mass. App. Ct. 606, 610 (1976), such evidence may be admissible for other relevant, probative purposes. *Commonwealth* v. *Caine*, 366 Mass. 366, 370–371 (1974). However, if the "value of the statement as legitimate proof appear[s] to be substantially outweighed by the danger of prejudice not correctable by the good sense of the jury, a case could be made for excluding it . . . ." *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 816 (1973). "[W]here a circumstance is relevant for some purpose, the incidental revelation, in offering it, of other criminal conduct by a defendant does not stand in the way of receiving the evidence." *Commonwealth* v. *Deschamps*, 1 Mass. App. Ct. 1, 3 (1972), quoting from 2 Wigmore, Evidence § 416 (3d ed. 1940). *Commonwealth* v. *Caine, supra* at 370–371.

automobile and only two had gotten back in. Dolson then testified that he and Edgerly went back to a club in Lowell and continued drinking. There was nothing in Dolson's statement which permitted the jury to conclude that Smith had been murdered. See *Commonwealth* v. *Nassar,* 351 Mass. 37, 43 (1966). There was nothing unusual about the event described. It would have been far more likely that the jury would conclude that Smith left the two behind and went off on his own. No harm to the defendant has been demonstrated.

2. The defendant maintains that it was error for the judge to admit testimony concerning his arrest on another occasion. During cross-examination of Detective Lieutenant Peter Agnes of the State police, who had arrested the defendant in February, 1975, on a warrant issued pursuant to the larceny indictment, defense counsel accidentally referred to "1974" instead of "1975" as the date of the arrest. The transcript shows that counsel corrected himself and continued his cross-examination. On redirect, over the defendant's objection, the prosecutor was allowed to inquire of Lieutenant Agnes whether Edgerly had in fact been arrested in February, 1974 (the arrest of Edgerly on the murder indictment occurred in February, 1974). The question regarding the crime for which he had been arrested in 1974 was excluded. The judge erroneously stated that defense counsel had opened the subject on cross-examination by bringing in the date of February, 1974, and by not correcting it until "two questions later." However, we fail to see how the defendant was harmed. His argument is based on the possibility that the jury could have tied the arrest in with the murder of Smith. However, as there was no mention of murder before the jury, they could not have connected the arrest with that alleged crime.

3. Other contentions relate to the admission of testimony regarding an alleged larceny from Toyota by the same means as alleged in the present case. We think the evidence was properly admitted. Butler and Lowell Toyota

were a dual dealership located on the same premises, and the defendant's earnings came in part from a percentage of the warranty claims credited to Butler by Toyota. There is a well established rule in this Commonwealth that "[s]ome offenses are not so plain and distinct and so connected with visible facts that the accompanying intent can be inferred without further aid. Obtaining money or property by fraudulent pretenses under some conditions belongs to this class. Conduct of one on another occasion reasonably near in time under similar circumstances if appearing to be parts of a comprehensive scheme by which different persons are to be defrauded, may have an important bearing upon his purpose in doing a particular act." *Commonwealth* v. *Farmer*, 218 Mass. 507, 512–513 (1914). *Commonwealth* v. *Baker*, 368 Mass. 58, 85–86 (1975). Contrast *Commonwealth* v. *Stone*, 321 Mass. 471, 473 (1947). Evidence of the alleged larceny from Toyota was relevant to the defendant's intent to steal from G.M.

4. The defendant complains about a comment by the prosecutor which he claims implicated him in the murder of Smith. He also objects to the admission of testimony regarding pending indictments against other persons in connection with the warranty scheme at Butler. We have carefully reviewed the pertinent parts of the transcript, and we find that the claims are without substance.

*Cross-examination*

Another of the defendant's arguments relates to what he alleges was the judge's improper curtailment of cross-examination. We, of course, recognize that the rights of confrontation and cross-examination are basic to our adversary system and are guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. *Pointer* v. *Texas*, 380 U.S. 400, 403–406 (1965). *Chambers* v. *Mississippi*, 410 U.S. 284, 295 (1973). We do not find any infringement of those rights which prejudiced the defendant.

1. One Boutin testified for the Commonwealth. She had worked for Edgerly at Butler preparing and typing 970 forms for submission to G.M. Her testimony was almost exclusively concerned with office routine. She described the forms and the procedure usually followed in submitting the claims. Defense counsel assailed her credibility on several grounds. She had testified that she processed only claims signed by Edgerly personally. Counsel introduced several forms signed by other Butler personnel which she had typed. He also obtained an admission from her that, at a time when several false claims which had been admitted in evidence had been processed, the defendant was away from the office. Defense counsel further attempted to impeach Boutin's testimony by questioning her about allegedly contradictory statements she had made at a deposition in a civil action in which G.M. had sued Butler to recover the money it had paid Butler on fraudulent warranty claims. That deposition transcript, together with all the documents in the civil case, had previously been impounded by an order entered in the civil action for the purpose of preventing prejudicial pretrial publicity in the present and related criminal trials. The judge ruled that because of the impoundment order defense counsel could not use that deposition for the purpose of impeachment.

The judge should have allowed cross-examination based on the deposition. *Ex parte Uppercu, petitioner*, 239 U.S. 435 (1915). The defendant has failed, however, to demonstrate that he suffered from this error. The deposition was not marked for identification and produced before us. Thus we are left to speculate as to any possible harm.[5] Boutin had testified to office routine, and her cred-

---

[5] We have difficulty in determining what testimony the defendant desired to contradict. Boutin was asked whether she had made a statement to anyone that the G.M. representatives would review the Butler warranty claims before they were submitted:

THE WITNESS: "That was my understanding, so I probably did."

DEFENSE COUNSEL: "Well, you did make that statement, did you not?"

ibility had already been strenuously attacked by defense counsel. In fact, she was so upset by counsel's persistent cross-examination that the judge was required to recess the trial in order to give her time to compose herself. Contrast *Commonwealth* v. *Franklin,* 366 Mass. 284, 288– 291 (1974), where the defendant was not allowed to cross- examine a crucial prosecution witness on a critical issue of the case.

2. Nor did the judge err in denying a motion to require the attendance of two out-of-State witnesses at trial. On the day the jury were to be empanelled the defendant moved, pursuant to G. L. c. 233, §§ 13A–13D (the uniform law to secure witnesses from without the State in crimi- nal proceedings), to compel the attendance of twelve out- of-State witnesses to testify at trial. There was no address listed for any of the proposed witnesses, and no explana- tion of the materiality of their testimony to the defend- ant's case. That motion was denied after hearing on the ground that "during the hearing on the motion the de- fendant was unable to inform the court of the possible materiality of these witnesses." Another reason given for the denial was the possibility of lengthy delays during the course of the trial due to the out-of-State hearings on the issue of materiality provided for by the statute.

Three weeks into the trial the defendant renewed the motion, this time limiting his request for attendance of out-of-State witnesses to two, Raymond S. Pasternak, an executive of G.M. in Detroit, Michigan, and R. Gordon Butler, the owner of Butler, who was a resident of Massa-

---

THE WITNESS: "I don't remember."

THE JUDGE: "She said she probably did . . . [counsellor]."

DEFENSE COUNSEL: "She said she doesn't remember."

It was at that point that defense counsel tried to introduce Boutin's testimony at the deposition. It appears from the above colloquy that she had testified in the manner that the defendant wanted. Any fur- ther statement by her would have been merely cumulative. No argu- ment has been made that the deposition might have been used to refresh the witness' recollection.

chusetts but then living in New York city. Both those persons had been included in the earlier motion. The judge held a hearing on the renewed motion and again denied the defendant's request. There was no written memorandum of decision on the renewed motion, and the discussion at the bench does not make clear exactly what grounds the judge relied on. But the record does show that the judge was not convinced that the testimony of the witnesses whom the defendant sought to summon would be material to the case. The judge was also concerned about further delaying the trial, particularly as the jury were sequestered.

The defendant claims that the judge's denial of his renewed motion denied him effective confrontation and cross-examination. We disagree. The right to have witnesses brought in from other States is not a constitutional right.[6] Out-of-State witnesses may be summoned only under the procedures of the interstate act when both the State requesting the witness and the State where the witness is located have adopted it. It is a statutory procedure which a trial judge may invoke in his discretion. The question therefore is whether on the facts presented the judge abused his statutory discretion in declining to compel the testimony of out-of-State witnesses. General Laws c. 233, § 13B, inserted by St. 1937, c. 210, § 1, reads, in pertinent part, that if a potential witness "is a material witness in a criminal proceeding pending in a court of record in this commonwealth . . . a justice or special justice of such court *may* issue a certificate under the seal of the court, stating such facts . . . which certificate may be presented in accordance with the laws of such other state to a magistrate or officer thereof for appropriate

---

[6] The constitutional right of compulsory process has been held applicable to the States, *Washington* v. *Texas*, 388 U.S. 14, 17–19 (1967), but it only extends to in-State process. *State* v. *Smith*, 87 N.J. Super. 98, 102 (1965). *People* v. *Cavanaugh*, 69 Cal. 2d 262, 265–266 (1968), cert. denied, 395 U.S. 981 (1969). See *Minder* v. *Georgia*, 183 U.S. 559, 562 (1902).

action to secure the attendance of such witness in this commonwealth" (emphasis supplied). That statute contemplates that the materiality of the testimony be shown in the certificate of the judge of the demanding State, or else in separate proceedings commenced upon that certificate in the requested State. *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 305–306 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972). Even after a showing of materiality, the decision whether to issue a certificate of demand rests within the judge's sound discretion. The statute has been consistently so construed. *People* v. *Cavanaugh*, 69 Cal. 2d 262, 266–267 (1968). *People* v. *Newville*, 220 Cal. App. 2d 267, 274–275 (1963). *State* v. *Lesco*, 194 Kan. 555, 560, cert. denied, 382 U.S. 1015 (1965). See *Feguer* v. *United States*, 302 F.2d 214, 240–241 (8th Cir.), and cases cited, cert. denied, 371 U.S. 872 (1962); *United States* v. *Zuideveld*, 316 F.2d 873, 880–881 (7th Cir. 1963), cert. denied, 376 U.S. 916 (1964); *Thompson* v. *United States*, 372 F.2d 826, 828 (5th Cir. 1967). It appears that the judge's action was well within the bounds of his discretion; indeed, on the showing made to him, it would have been error to allow the motion. *Commonwealth* v. *Dirring*, 354 Mass. 523, 529–530 (1968).

*Interruptions of Defense Counsel's Closing Argument*

The defendant asserts that the judge erred in commenting throughout defense counsel's final argument that counsel was misrepresenting the evidence or was arguing improperly. Our review of the transcript indicates that, with only one exception, the judge was correct in his comments.[7] Having read and considered defense coun-

---

[7] This incorrect comment occurred when the judge, on objection by the prosecutor, curtailed defense counsel's argument that Tremblay had testified to the defendant's being told by G.M. field representatives that if Butler would accept for sale several fleets of cars which were unmarketable due to various production line mistakes, G.M. would let Butler take $200–$300 worth of warranty credit on each car

sel's closing argument, we conclude that the single error was not harmful.[8] The defendant does not contend that the interruptions by the prosecutor amounted to misconduct on his part.

The Supreme Judicial Court has said that "[g]reat latitude should be permitted to counsel in argument . . . ." *Commonwealth* v. *Pettie*, 363 Mass. 836, 840 (1973). But the scope of his presentation must remain within the bounds of the evidence and fair inferences from the evidence. *Commonwealth* v. *Earltop*, 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring). It is the duty of the judge to guard against improper argument to the jury, and the method of controlling argument rests largely within his discretion. *Commonwealth* v. *Witschi*, 301 Mass. 459, 462 (1938). *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 56–57 (1975). The judge was faced with a difficult situation. It would have been perfectly proper and well within his discretion to instruct the prosecutor to limit his objections to occasions when defense counsel clearly exceeded the bounds of permissible argument. Many times the judge ignored the objection or merely told defense counsel to proceed. However, at other times, the prosecutor was correct, and the judge acted within his discretion on these occasions so to inform the jury. The defendant argues that in commenting to the jury that various points in defense counsel's argument were not supported by the evidence, the judge usurped the function of the jury and gave them the impression that coun-

in order to make up any loss Butler might suffer on the sale of those cars. This argument was supported by evidence in the record which was never retracted by Tremblay. No exception was taken to that particular comment, but counsel excepted to an admonition by the judge that, "You know you have an obligation to confine yourself to the evidence."

[8] The prosecutor interrupted defense counsel's argument more than forty times. On at least fourteen of those occasions, he was ignored or overruled by the judge. On each of the other occasions the judge took the opportunity to comment on defense counsel's presentation of the evidence or form of argument.

sel was deliberately misstating the facts. Such was not
the case. The judge did not instruct the jury as to any
inference they should or should not draw from the evi-
dence. Contrast *Commonwealth* v. *Borges,* 2 Mass. App.
Ct. 869 (1974). He merely performed his duty to keep
improper argument from the jury. When his admonitions
to counsel are considered together with the statements
and rulings he made which were favorable to the defend-
ant, it is clear that the judge was acting as a neutral
moderator. In his instructions to the jury at the close of
the trial, the judge said, "I don't for a moment want
anything said by any of the attorneys or anything said to
them by the Court in the nature of a colloquy to be held
against either attorney for the respective side that he
represents, and I please ask you to disregard any remarks
made during the course of the trial, any colloquy between
the Court and attorneys . . . ." This instruction was a suf-
ficient reminder to the jury of their duty to decide the
case on the evidence and not to allow extraneous factors
to interfere with their verdict.

*The Prosecutor's Closing Argument*

The defendant complains of allegedly prejudicial state-
ments on the part of the prosecutor during the course of
the prosecutor's argument. As we have noted previously,
this was a long and hard fought trial. The tempers and
patience of both counsel grew short as the days wore on.
The prosecutor demonstrated some of his impatience in
his closing argument. His remarks were not always con-
fined to the permissible bounds of proper argument.
Those remarks were, however, countered and cured by
cautionary instructions from the judge. In one instance
the judge cautioned the jury to disregard a statement by
the prosecutor; and, immediately after the closing, before
recessing for lunch, the judge gave the jury further cau-
tionary instructions on all but one of the other remarks
of which the defendant now complains. Furthermore, in
his charge, which was given after the luncheon recess, he
emphasized several times that the arguments of counsel
were not to be considered as evidence.

We consider more fully the prosecutor's remarks which related to the disappearance of Smith and as to which no specific curative instruction was given. While trying to counteract the defendant's claim that he lacked the necessary criminal intent to steal, the prosecutor directed the jury's attention to the night of January 30, 1974 (the night Smith was allegedly murdered): "Dolson, Edgerly and Smith, sitting in a barroom drinking .... And what happens then? Three men go out and two come back .... Where was Mr. Smith? Ask yourselves if that has anything to do with a coverup ...." At the end of the argument the defendant excepted to the prosecutor's remarks, expressing his feeling that no curative instruction could counteract the prejudice.[9] In his charge, after informing the jury that the arguments of counsel are not evidence, the judge gave the following instruction: "A further thing that should be disregarded by you is the absence of witnesses in this case. Now it was commented that mechanics whose names I don't recollect at the moment, a gentleman by the name of Smith, other people who were mentioned throughout the trial, were not present here to give testimony. Their presence certainly is not affirmative evidence, or their lack of presence, I should say, is not affirmative evidence and should not be considered by you .... So please disregard any reference to any person mentioned during the course of this trial who was not here to testify ...." We think that this instruction was an adequate warning to the jury to disregard and to draw no inference from what might have been a prejudicial remark by the prosecutor. We note

---

[9] The objection was timely. Failure to object during a closing argument does not preclude appellate consideration where, as here, defense counsel requests a curative instruction at the conclusion of closing argument which brings the alleged error to the judge's attention. *Commonwealth* v. *Haas*, 373 Mass. 545, 559 (1977). *Commonwealth* v. *Burke*, 373 Mass. 569, 575 (1977). The defendant also moved for a mistrial because of the remarks, but he did not except to the denial of that motion.

again that the jury had not been told of Smith's death and that it was impossible for them to draw the inference from the prosecutor's statement that counsel could draw. (See *supra* at 250-251.) The judge rightly deemphasized the reference by admonishing the jury to disregard the prosecutor's comment concerning the absence of Smith and other witnesses who had not been called. The jury are deemed to have followed the judge's instructions to disregard matters withdrawn from their consideration. *Commonwealth* v. *Eagan*, 357 Mass. 585, 589 (1970).

We do not mean to voice approval of everything in the prosecutor's summation to the jury. Both prosecution and defense counsel should confine themselves to arguing from the evidence and the inferences which may properly be drawn from the evidence. When viewed, however, in the overall context of this trial, including the strong curative instructions given by the judge, the prosecutor's remarks were not so prejudicial as to justify reversal. *Commonwealth* v. *Lussier*, 364 Mass. 414, 424 (1973). See *Commonwealth* v. *D'Ambra*, 357 Mass. 260, 262 (1970); *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 536–539 (1971); *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 313–316 (1973); *Commonwealth* v. *Earltop*, 372 Mass. 199, 204 (1977). Contrast *Commonwealth* v. *Graziano*, 368 Mass. 325, 332 (1975); *Commonwealth* v. *Redmond*, 370 Mass. 591, 596–597 (1976); *Commonwealth* v. *Killelea*, 370 Mass. 638, 644–649 (1976); *Commonwealth* v. *Haas*, 373 Mass. 545, 558–562 (1977); *Commonwealth* v. *Burke*, 373 Mass. 569, 574–577 (1977); *Commonwealth* v. *Shelley*, 374 Mass. 466, 469-471 (1978).

*The Charge*

The defendant has assigned as error both the judge's giving of certain instructions and his failure to instruct in a manner requested by the defendant. We consider each separately.

1. The defendant contends first that it was error for the judge to refuse to give an instruction requested by him at the conclusion of the charge that if an agent of G.M. had

apparent authority to bind his principal, and the defendant believed that he did, evidence of such authority could be considered probative of the defendant's state of mind and lack of criminal intent. The argument is misplaced. The authority, actual or apparent, of the G.M. representatives to bind G.M. to any kind of civil liability for the warranty claims was not a relevant issue.

It is necessary to show in the proof of larceny by false pretenses that the defendant intended that the victim rely on the misrepresentations, and the judge adequately instructed the jury as to such intent. The charge on that issue is set out in the margin.[10] Edgerly's belief that the representatives of G.M. were authorized to make the warranty arrangement of concern here was the only important fact for the jury's determination. There was no need for the jury to determine whether any of the G.M. representatives had actual or apparent authority to make the statements attributed to them, and the judge was correct in refusing so to charge. Furthermore, the judge's instructions were substantially as requested in a written request submitted earlier by the defendant.

2. The defendant objects to a supplemental charge given by the judge, claiming that the judge, in informing the jury of the elements of the crime of larceny by false pretenses, submitted a lower standard of reliance than that required by the case law. The judge instructed the jury on four separate occasions in his main charge as to what they must find in order to find the defendant guilty of larceny by false pretenses. The instructions included

[10] "Now the defendant has claimed by way of defense, that Mr. Edgerly did not have larcenous intent because he reasonably believed [that] statements made by agents and employees of the Chevrolet Motor Division of General Motors represented a policy of that corporation within the area of warranty procedures and submissions. Now if you find that the defendant Edgerly did lack intent necessary, as defined in the statute, then of course, you must find him not guilty. You would have to find that he was in a position to reasonably believe that his conduct was not [*sic*] without guilt or fault."

varying expressions of the element of reliance. He charged (1) that the victim must rely "to some extent" on the misrepresentation, (2) that the victim must be "materially influenced" in his action by the false representation, and (3) that the victim did rely on the misrepresentation as true (given twice). After each of those instructions, the judge informed the jury to the effect that the "fifth" element was that "*as a result* of the reliance, the person or corporation parted with real or personal property" (emphasis supplied). The defendant took no exception to any of those instructions. After deliberating for fifteen minutes, the jurors returned to the courtroom with two requests for further instructions. In one, they asked the judge to repeat the "five" elements of larceny by false pretenses. The judge then gave the instruction set out in the margin,[11] to which the defendant excepted. It is this instruction which the defendant claims substituted a lower standard of reliance which does not parallel or adequately describe the requirement that the false representation "materially" or "decisively" influence the victim to take a particular action.

In order to prove the offense of larceny by false pretenses the Commonwealth must offer evidence that the defendant made a false statement known or believed by him to be false with the intent that the person to whom it was made should rely upon its truth and that this person did rely upon it as true and as a result parted with personal property. *Commonwealth* v. *Green*, 326 Mass. 344, 348 (1950), and cases cited. *Commonwealth* v. *Barrasso*, 342 Mass. 680, 683 (1961). *Commonwealth* v. *Ian-*

---

[11] "[I]t must be proven by the Commonwealth beyond a reasonable doubt that, one, the defendant made a false statement; two, which the defendant knew or believed to be false; three, with the intent that the person or corporation to whom the false statement was made rely on its truth; four, that the person or corporation, did, in fact, rely to some extent on the truth of the representations; and five, that *as a result* of the reliance, the person or corporation parted with personal or real property" (emphasis supplied).

*nello,* 344 Mass. 723, 734 (1962). *Commonwealth* v. *Hamblen,* 352 Mass. 438, 442 (1967). The representations, however, "need not be the sole or predominating motive that induced the victim to part with his money or property . . . it is enough if they alone or with other causes materially influenced him to take the particular action . . . ." *National Shawmut Bank* v. *Johnson,* 317 Mass. 485, 490 (1945). *Commonwealth* v. *Iannello, supra* at 737. It is enough to constitute the crime of larceny by false pretenses if the fraudulent representation "was a decisive although not the sole influence operating upon the mind of the person to induce the giving up of money. Other statements or considerations not amounting to false pretenses may cooperate to that result without impairing the force of the criminal act." *Commonwealth* v. *Farmer,* 218 Mass. 507, 513 (1914). *Commonwealth* v. *Morrison,* 252 Mass. 116, 125 (1925). *Commonwealth* v. *Steinberg,* 265 Mass. 45, 50 (1928). *Sandler* v. *Elliott,* 335 Mass. 576, 580 (1957). *Commonwealth* v. *Greenberg,* 339 Mass. 557, 575 (1959). *Commonwealth* v. *Camelio,* 1 Mass. App. Ct. 296, 300 (1973). The Supreme Judicial Court has also described the requirement in terms of the misrepresentations being one of the "principal grounds" that cause a person to take the action which he would not otherwise have taken (*Kabatchnick* v. *Hanover-Elm Building Corp.,* 331 Mass. 366, 371 [1954] and "one of the factors" which induces the plaintiff to take certain action (*Golding* v. *108 Longwood Avenue, Inc.,* 325 Mass. 465, 468 [1950]).

It is clear that the misrepresentations need not be the sole reason for the victim's parting with his property. The term "to some extent," though not precise, is not incorrect. When the instruction that the victim must rely "to some extent" was coupled with the instruction that the parting with property must come "as a result of" the reliance, the instructions were sufficiently favorable to the defendant. A judge is not required to instruct the jury in exact accord with a defendant's request. *Common-*

*wealth* v. *Lussier,* 333 Mass. 83, 93 (1955). *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 539 (1971). We have read the entire charge and examined the probable over-all impact of the instructions on the jury. We conclude that they were given the guidance they needed to determine the issue. *Commonwealth* v. *Pinnick,* 354 Mass. 13, 15 (1968).

*Motion for a New Trial*

Pursuant to G. L. c. 278, § 29, the defendant moved for a new trial on the ground that justice might not have been done at his trial. After a hearing the judge denied the motion, and the defendant excepted. The defendant concedes that a motion for a new trial is addressed to the discretion of the court, *Commonwealth* v. *Gagne,* 367 Mass. 519, 526 (1975), unless the trial was infected with prejudicial constitutional error. See *Earl* v. *Commonwealth,* 356 Mass. 181, 184 (1969). The motion raised no question of significance which has not already been considered in the course of our opinion. There was no abuse of discretion.

*Failure of Judge to Disqualify Himself*

During the course of the trial the judge wrote a letter to the Board of Bar Overseers reporting the conduct of defense counsel in attempting to use the impounded deposition earlier referred to. At sentencing defense counsel requested the judge to disqualify himself from imposing sentence on the ground that the judge's alleged prejudice against counsel might result adversely to the defendant. The judge stated that the conduct of counsel in the case would have nothing to do with the imposition of sentence, which was a separate and distinct matter. There is no showing by the defendant that the judge failed to remain impartial, or was prejudiced in imposing sentence. See *Lena* v. *Commonwealth,* 369 Mass. 571 (1976); *Commonwealth* v. *Keigney,* 3 Mass. App. Ct. 347, 349 (1975).

*Miscellaneous*

1. In the course of a discussion concerning the substitution in evidence of copies for an original set of records,

there was a reference to other civil and criminal proceedings, reference to the latter having been made by the prosecutor. The judge indicated that he would not "tie up [the] book permanently" because of the possibility "of some appellate procedure." The defendant excepted to the reference to "some appellate procedure." The only argument made by the defendant is that the judge's remark suggested to the jury that they should draw the inference that the defendant should be convicted and that that was an impermissible interference with the functioning of the jury.[12] The Supreme Judicial Court has recently held that there is nothing inherently prejudicial in such a remark as that made by the judge. *Commonwealth* v. *Walker*, 370 Mass. 548, 574–576 (1976). Such a statement is only reversible error when the remarks "have the inescapable effect of reducing the jurors' appreciation of the significance of their deliberations and verdict." *Id.* at 574. We note that this discussion which was carried on in the presence of the jury was not directed to them. We are not persuaded that words taken out of the context of the discussion had any effect on the jury, let alone the effect the defendant would have us believe. With regard to the impact of this reference to appellate procedure, we wonder what the jury might have thought was the reason for the more than 500 exceptions taken by the defendant.

2. On the thirteenth day of trial the judge suspended the session at 3:00 P.M., telling the jury that this would allow defense counsel time to inspect a large number of documents in the custody of the prosecutor, kept at his office in Cambridge. The defendant had subpoenaed the documents on the previous day but because of the bulk of the documents and the fact that the case was being tried in Lowell, the only practical way for the prosecutor to

---

[12] The brief also incorporates by reference an argument made on the point we have discussed under "The Witness Donald Tremblay," *supra* at 246.

comply with the subpoena was to allow the defendant and his counsel to inspect the records in Cambridge. The defendant moved for a mistrial, stating that the judge improperly attributed delay to the defendant when he excused the jury early. The exception is to the denial of this motion. Our reading of the transcript of the incident discloses that this exception is utterly devoid of merit.

As stated at the outset, we have discussed all the assignments which are based on exceptions, which have been argued, and which merit discussion. The exceptions not specifically discussed have either been subsumed in the discussion of other points or are so devoid of merit as not to warrant attention.

*Judgment affirmed.*