NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1359

COMMONWEALTH

vs.

MOHAMMED MATT REZA ENAYAT.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After hearing evidence that, in connection with the lease or purchase of three vehicles, the defendant persuaded a "straw" purchaser (buyer) to submit to car dealerships credit applications that misrepresented the buyer's income and employment, a Superior Court jury convicted the defendant of three counts of larceny by false pretenses of property valued at more than $250, G. L. c. 266, § 30 (1), as then in effect; and three counts of false pretenses related to credit transactions, G. L. c. 266, § 33 (2).  On appeal, the defendant argues that

_____

[1] As is our custom, we adhere to the spelling of the defendant's name as it appears in the indictments.

the evidence was insufficient to prove that the car dealerships or the lending banks relied on the misrepresentations, and the judge abused his discretion in declining to give a missing witness jury instruction because the Commonwealth did not present testimony of any bank employee.  The defendant also contends that a substantial risk of a miscarriage of justice arose from the prosecutor's closing argument.  We affirm.

Background.  In 2016, the defendant persuaded the buyer to accompany him to car dealerships in Norwood and Burlington, where, purportedly on behalf of ABC Fine Rugs, Inc. (ABC Fine Rugs), the buyer cosigned three credit applications for vehicles.[2]  For each of the three vehicles, both the buyer and ABC Fine Rugs were listed as co-lessees or copurchasers.  The address and telephone number listed for the buyer were actually those of the defendant.  The applications contained representations that the buyer earned an annual salary of $150,000 as either the president or treasurer of ABC Fine Rugs.  During one of the transactions, the salesperson verified the buyer's identity by taking a photocopy of an American Express Business Platinum credit card printed with the buyer's name and that of ABC Fine Rugs.  In fact, the defendant was the owner of

_____

[2] The buyer testified pursuant to a cooperation agreement, and the judge instructed the jury in accordance with Commonwealth v. Ciampa, 406 Mass. 257, 266 (1989).

2

ABC Fine Rugs; the buyer was never a salaried employee of ABC Fine Rugs, was not its president or treasurer, and did not earn an annual salary of $150,000, and the American Express card was not his.

Those transactions resulted in a lease valued at more than $50,000 of a 2016 Land Rover Range Rover, a loan of more than $40,000 for the purchase of a 2015 Mercedes-Benz cargo van, and a loan of more than $80,000 for the purchase of a 2012 Maserati GranTurismo two-door coupe. The buyer never drove any of the vehicles. The defendant drove all three vehicles, and kept the Maserati and the Mercedes-Benz garaged at his home. The defendant was the only person who drove the Maserati, though his girlfriend and an ABC Fine Rugs employee sometimes drove the other two vehicles.

The jury convicted the defendant of the charges outlined above.[3] The defendant appeals.

Discussion. 1. Sufficiency of the evidence. The defendant argues that the Commonwealth did not prove that the car dealerships or the banks relied on any misstatements in the credit applications. Considering the evidence in the light most favorable to the Commonwealth, see Commonwealth v. Lewis, 48

---

[3] After a bifurcated, jury-waived trial, the judge also convicted the defendant of being a common and notorious thief, G. L. c. 266, § 40.

Mass. App. Ct. 343, 351 (1999), citing Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), we conclude that the evidence sufficed to permit a rational trier of fact to conclude that the car dealerships and the banks relied on one or more false statements in the credit applications.

The offense of larceny by false pretenses required proof that a false statement materially influenced the dealership to part with its property. See Commonwealth v. Edgerly, 6 Mass. App. Ct. 241, 263 (1978). Similarly, the offense of false pretenses related to credit transactions required proof that a false statement materially influenced the banks to extend credit. See Commonwealth v. Duddie Ford, Inc., 28 Mass. App. Ct. 426, 441 (1990), S.C., 409 Mass. 388, 396-397 (1991). "[T]he false statements 'need not be the sole or predominating motive that induced the victim[s] to part with [their] money or property . . . [;] it is enough if [the statements] alone or with other causes materially influenced [them] to take the particular action.'" Duddie Ford, Inc., supra, quoting Edgerly, supra. Thus, the evidence would be sufficient if the Commonwealth proved that a "fraudulent representation 'was a decisive although not the sole influence operating upon the mind of the person to induce the giving up of money [or property].'" Edgerly, supra, quoting Commonwealth v. Farmer, 218 Mass. 507, 513 (1914). See Lewis, 48 Mass. App. Ct. at 351.

4

The jury could find that the dealerships and the banks relied on the buyer's statements in the applications. Each of the three credit applications contained printed language warning, "You understand that we will rely on the information in this credit application in making our decision." In addition, the finance director for the Land Rover dealership testified that a lending bank uses the information in the credit application, including the salary of the borrower, to make the decision whether to approve the loan. Cf. Duddie Ford, Inc., 28 Mass. App. Ct. at 440 (bank vice president testified that, although he was not familiar with specific car loan, it was "banking industry practice" to rely on information in application for loan).

Focusing on the false statements that the buyer earned a $150,000 salary, the defendant argues that the Commonwealth did not prove that the dealerships or the banks relied on that information, positing that a bank might extend credit based on a purchaser's credit score alone. We are not persuaded. A reasonable juror could infer that the banks and car dealerships relied on false statements in the credit applications, which were not limited to the buyer's purported income. Indeed, nearly every statement in the credit applications was false. The other false statements included that the buyer was employed by and an officer of ABC Fine Rugs, had the authority to cosign

5

for the loan on its behalf, and possessed the American Express Business Platinum card associated with that business. They also misrepresented the buyer's employment history, the amount he paid toward his monthly rent, and his address and telephone number, which were actually those of the defendant. Whether a car dealership or bank relied more heavily on a particular one of those false statements does not matter. See Edgerly, 6 Mass. App. Ct. at 263. We conclude that the jury could find that the car dealerships and the banks relied on at least one of those false statements.

The defendant also argues, with little elaboration, that the Commonwealth failed to prove that he made the false statements or caused them to be made. We disagree. The evidence showed that the defendant arranged all of the deals and benefited from them, but the buyer gained no benefit. In addition, the buyer testified that he did not make the false statements, and that the defendant handed him the completed paperwork and told him to sign. Based on this evidence, the jury could have found that the defendant made the false statements or, at a minimum, caused them to be made.

2. Absence of missing witness instruction. The defendant contends that the judge abused his discretion by declining to give a missing witness instruction with respect to the Commonwealth's failure to call a witness from any of the banks.

6

"Because such an instruction can be a powerful influence on the jury, a missing witness instruction should be provided 'only in clear cases, and with caution.'" Commonwealth v. Wilkerson, 486 Mass. 159, 177 (2020), quoting Commonwealth v. Williams, 475 Mass. 705, 721 (2016). See Mass. G. Evid. § 1111 note (2025). "The decision whether to give a missing witness instruction is committed to the 'discretion of the trial judge, and will not be reversed unless the decision was manifestly unreasonable.'" Wilkerson, supra, quoting Commonwealth v. Saletino, 449 Mass. 657, 667 (2007).

As discussed above, the jury could infer from the credit applications and the testimony of the Land Rover dealership's finance director that the banks relied on the misrepresentations. In those circumstances, the Commonwealth could have determined that the testimony of a bank employee would have been cumulative and not necessary to its case. See Saletino, 449 Mass. at 668 ("[missing witness] instruction should not be given where the Commonwealth has legitimate tactical reasons for not calling the witness"). As the judge suggested, defense counsel argued in closing that by not presenting the testimony of a bank employee, the Commonwealth had not proven its case. Unlike such an argument, however, a missing witness instruction would have informed the jury that they were permitted to infer that, if called as a witness, a

7

bank employee would have given testimony unfavorable to the Commonwealth.  See id. at 672.  As the judge found, however, that inference "call[ed] for significant speculation and a huge inferential leap from [the] evidence."  We discern no abuse of discretion in the judge's ruling declining to give such an instruction.

3.  Prosecutor's closing argument.  Finally, the defendant argues that a substantial risk of a miscarriage of justice arose from the prosecutor's closing argument.  The defendant contends that the prosecutor committed misconduct by referring in closing to facts not in evidence, disparaging the defendant's case, and injecting his personal beliefs.

First, the defendant argues that the prosecutor argued facts not in evidence when he said, "everyone knows that [the banks are] going to rely on this, and that they did rely on it because . . . a loan was made based on this."  The defendant reads "this" to be referring to the false statement about the buyer's income.  Considering the statement in context, we think the fairer reading is that the prosecutor was referring to the information in the credit applications as a whole.  In any event, even if the statement is susceptible of either reading, we conclude that no substantial risk of a miscarriage of justice arose, for the reasons stated below.

8

Second, the defendant argues that the prosecutor impermissibly characterized as "bunk" defense counsel's argument that the banks had not relied on the misstatements in the credit applications. "A prosecutor may address a particular point in defense counsel's closing argument as a sham, but he may not characterize the entire defense as such." Commonwealth v. Lewis, 465 Mass. 119, 130 (2013). We have carefully reviewed the arguments of both counsel. We read the prosecutor's closing as addressing a particular point in defense counsel's closing -- that the banks had not relied on the misstatements -- and characterizing it as "bunk," rather than disparaging the entire defense. See Commonwealth v. Kostka, 489 Mass. 399, 415-417 (2022) ("not improper" for prosecutor to characterize as "gamesmanship" defense counsel's attack on validity of lottery records); Lewis, supra. Contrast Commonwealth v. Fahey, 99 Mass. App. Ct. 304, 313 (2021) (prosecutor "crossed the line by excessively mocking the defendant's defense," calling theory "this ridiculous, ridiculous notion").

Finally, the defendant contends that the prosecutor injected his personal beliefs by using the words "I know." The prosecutor argued, "I don't know much about straw purchases, but I know that I cannot buy a car for [co-counsel] . . . and make her financially responsible for it . . . and I get the benefit of driving it." Contrary to the defendant's argument, that

9

explanation of a straw purchase was merely an illustration and did not amount to the prosecutor's injecting his personal beliefs about the credibility of witnesses.  See Commonwealth v. DaCosta, 96 Mass. App. Ct. 105, 116-117 (2019) (in context, prosecutor did not inject personal beliefs by arguing, "[c]ommonsense would tell me that if my friend was going to rob a drug dealer who might be armed, I wouldn't be in a big hurry to get out of that car when your friend does").

The defendant did not object to these remarks, which is some indication that their tone and manner were not unfairly prejudicial.[4]  See Commonwealth v. Camacho, 472 Mass. 587, 609 (2015).  The judge instructed, both at the beginning of trial and again in his final charge, that closing arguments are not

---

[4] The defendant did object to the prosecutor's comment, without basis in the evidence, that "maybe [a bank] called up the defendant."  The judge gave a prompt curative instruction, and the defendant does not raise the issue on appeal.

10

evidence.  We conclude that no substantial risk of a miscarriage of justice arose.

<u>Judgments affirmed</u>.

By the Court (Shin, Grant & Hershfang, JJ.[5]),

<i>Paul Little</i>

Clerk

Entered:  December 8, 2025.

---

[5] The panelists are listed in order of seniority.