PEOPLE v LOYER

Docket No. 79605. Submitted June 25, 1987, at Grand Rapids. Decided
June 6, 1988.

John D. Loyer was convicted of second-degree murder following a
jury trial in Iosco Circuit Court and was sentenced, Richard J.
Ernst, J. Defendant appealed.

The Court of Appeals *held:*

1. The trial court did not abuse its discretion in refusing to
compel the attendance at trial of three out-of-state witnesses.
Defendant failed to make out a prima facie case that the
testimony of those individuals was material.

2. The trial court erred in permitting the prosecuting attor-
ney to question defendant as to his assessment of the credibility
of certain prosecution witnesses. The error, however, was harm-
less.

3. The fact that more than five years passed between the
time evidence was gathered in this case and the time defendant
was charged does not entitle defendant to dismissal of the
charge against him. Defendant failed to show that he was
prejudiced by the delay.

4. The statute providing for the payment of subpoena and
witness fees for an indigent defendant otherwise unable to pay
such fees, to the extent that it mandates that a poor defendant
requesting the payment of service-of-process and witness fees
for proposed defense witnesses must reveal, in the presence of
the prosecution, the names and addresses of the witnesses, as
well as why such witnesses are material to his cause, is uncon-

REFERENCES

Am Jur 2d, Constitutional Law § 825.

Am Jur 2d, Criminal Law §§ 639 *et seq.,* 652 *et seq.,* 717 *et seq.,* 849
*et seq.,* 953 *et seq.*

Am Jur 2d, Witnesses §§ 8, 656 *et seq.*

Accused's right to speedy trial under Federal Constitution—Su-
preme Court cases. 71 L Ed 2d 983.

Sufficiency of evidence to support or require finding that out-of-state
witness in criminal case is "material witness" justifying certifi-
cate to secure attendance under Uniform Act to Secure the
Attendance of Witnesses from Without a State in Criminal Pro-
ceedings. 12 ALR4th 742.

stitutional, and the trial court erred in having the prosecutor present at defendant's motion for payment of service-of-process and witness fees for his proposed witnesses. The error, however, was harmless.

Affirmed.

T. K. BOYLE, J., concurred in the result, but disagrees with the majority's finding that the statute at issue is unconstitutional. He would hold that the trial court's interpretation and application of the statute was not erroneous.

1. WITNESSES — CRIMINAL LAW — CONSTITUTIONAL LAW — COMPULSORY PROCESS.

A criminal defendant's right to compulsory process for obtaining witnesses in his favor is not absolute, and the constitution does not grant the right to subpoena any and all witnesses a party might wish to call (US Const, Am VI; Const 1963, art 1, § 20).

2. WITNESSES — CRIMINAL LAW — OUT-OF-STATE WITNESSES — APPEAL.

A trial court's decision under the uniform act to secure the attendance of witnesses from without a state in criminal proceedings is left to its discretion and will not be reversed absent an abuse of discretion (MCL 767.93[1]; MSA 28.1023[193][1]).

3. WITNESSES — CRIMINAL LAW — OUT-OF-STATE WITNESSES.

A motion to secure the attendance of a witness pursuant to the provisions of the uniform act to secure witnesses from without the state in criminal proceedings is properly denied where a defendant in his petition has failed to designate with a reasonable degree of certainty the exact location of the witness, has failed to make out a prima facie case that the witness's testimony is material, or has failed to bring the petition in a timely manner (MCL 767.91 et seq.; MSA 28.1023[191] et seq.).

4. PROSECUTING ATTORNEYS — WITNESSES — COMMENTS ON CREDIBILITY.

It is improper for a prosecutor to ask a defendant to comment on the credibility of prosecution witnesses.

5. CRIMINAL LAW — DUE PROCESS — SPEEDY TRIAL.

The prosecutor, where there has been a delay between an alleged criminal transaction and the arrest of a defendant and where the defendant has shown some prejudice as a result of the delay, bears the burden of persuading the court that the reason for the delay is sufficient to justify whatever prejudice resulted; the burden of coming forward with evidence of prejudice is on the defendant, who is most likely to have facts regarding

prejudice at his disposal; the burden of persuasion rests with
the state, which is most likely to have access to facts concern-
ing the reasons for delay and which bears the responsibility for
determining when an investigation should end.

6. WITNESSES — CRIMINAL LAW — INDIGENTS — SUBPOENA AND
     WITNESS FEES — CONSTITUTIONAL LAW.
     The statute providing for the payment of subpoena and witness
     fees for an indigent defendant otherwise unable to pay such
     fees, to the extent that it mandates that a poor defendant
     requesting the payment of service-of-process and witness fees
     for proposed defense witnesses must reveal, in the presence of
     the prosecution, the names and addresses of the witnesses, as
     well as why such witnesses are material to his cause, is uncon-
     stitutional (MCL 775.15; MSA 28.1252).

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, and *Mark E. Blumer,*
Assistant Attorney General, for the people.

State Appellate Defender (by *Rolf E. Berg*), for
defendant on appeal.

Before: WAHLS, P.J., and R. M. MAHER and T. K.
BOYLE,* JJ.

WAHLS, P.J. Following a jury trial in the Iosco
Circuit Court, defendant, John Douglas Loyer, was
convicted of second-degree murder, MCL 750.317;
MSA 28.549, for the killing of his nineteen-year-
old wife, Helen Ann Loyer. Three months later, in
June, 1984, he was sentenced to a term of thirty to
fifty years imprisonment. Defendant appeals as of
right and we affirm, although in doing so we
declare unconstitutional a statute in the Code of
Criminal Procedure concerning the payment of
subpoena fees by the government on behalf of
indigent defendants, MCL 775.15; MSA 28.1252.

Defendant's conviction arises from events which

* Recorder's Court judge, sitting on the Court of Appeals by assign-
ment.

occurred on May 9, 1978, at the Oscoda residence of defendant and his wife, the victim in this case. Defendant was not arrested for the offense until 1983, and his trial did not begin until February, 1984.

The record reveals that on May 9, 1978, at 4:42 P.M., Shirley Scharich, a police dispatcher, received a telephone call from Albert Pirkl requesting that police officers and an ambulance be sent to defendant's home. Defendant himself told Scharich that his wife had been "tied up, beaten, and raped." As a result, Scharich immediately dispatched officers and an ambulance. Pirkl testified that on May 9, 1978, he was near defendant's residence when defendant approached him and stated that his wife had been beaten and raped and perhaps was not breathing. Pirkl called the police. He then accompanied defendant inside defendant's home and observed the victim lying on a bed. First, Pirkl unsuccessfully tried to detect the victim's pulse. When he extended the victim's neck in an attempt to administer CPR, her feet raised out of the bed, and Pirkl realized that she was dead and stiff.

Several other witnesses testified for the prosecution. Dianne Brown, apparently a neighbor of defendant, stated that sometime after 4:00 P.M. on May 9, 1978, she heard a scream and then observed a red car leaving the area. Marjorie Bevens, the victim's mother, testified that her daughter intended to join the U. S. Air Force and that, whenever she discussed this intention in defendant's presence, defendant exhibited "nasty looks." Mrs. Bevens also testified that her ex-husband had previously been found not guilty, by reason of self-defense, of killing her brother, and that one or two weeks after the death of her daughter, defendant asked her how her ex-husband "got off" for killing her brother. Angel Ponce, who shared a room with

defendant for a period of time, testified that one day during the winter of 1981 or 1982, he noticed that defendant was crying, and consequently asked him what was wrong. According to Ponce, defendant responded that he had killed his wife. Specifically, Ponce stated defendant told him that one day when he returned home for lunch, he tied up his wife with a rope, made love to her, and then killed her by way of suffocation.

Michael John Cleary, one of defendant's co-workers at the time of the killing, testified that, on the date of the victim's death, defendant seemed more rushed or nervous than usual. After lunch, defendant returned to work with the buttons missing from his shirt. A couple of weeks later, the two men were at a party together, drinking beer and smoking marijuana, and defendant said that "as soon as he got out of this he was going to get a new car and cruise." Another co-worker, Danny Myus, stated that approximately one week after the victim's death, when he saw defendant leaning against his car, he patted defendant on the back and inquired about what he was thinking. Myus related that defendant responded, "I'm thinking about something I'd done earlier that I didn't want to do, you know what I mean, Danny . . . ." After Myus acknowledged to defendant that he knew what he meant, he further inquired about what defendant was going to do, and defendant replied, "I'm going to wait until the last minute, and if they think I done it, I'm going to run." In addition, Stuart Popielarski, who lived with defendant during November, 1978, in Detroit, testified that, when he asked defendant whether he had killed his wife, defendant responded, "there are some things a man can never tell." On other occasions, defendant told Popielarski that he had to stay one step ahead of the law, that he could not be

"nailed" for "her" murder, that he had "out-slicked" the police, and that he could not return to the AuSable area because a man cannot return to the scene of a crime. Popielarski also stated that defendant informed him that he was angry that his wife intended to join the Air Force and that on May 9, 1978, he had had anal and vaginal intercourse with the victim while she was tied up. While Popielarski asserted that defendant told him that he had used a pillow to muffle the victim's screams, he acknowledged on cross-examination that defendant had also told him that someone must have broken into his home and smothered his wife.

Kevin Rozanek, a friend of defendant in 1979, testified that defendant said that he had tied his wife to the bed, put a pillow over her head, and killed her. Kevin Moors, who knew defendant in 1981, stated that defendant told him that he had suffocated his wife, but that he did not mean to do so. Marc Sivrais, a friend and co-worker of defendant, stated that, when he expressed his sorrow to defendant on the death of his wife approximately one and one-half weeks after the incident, defendant stated that he did not "regret it a bit" and that his wife "got what she deserved."

Larry Weddel, a police officer with the Oscoda/AuSable Township Police Department, testified that he was dispatched to defendant's home on May 9, 1978, by Shirley Scharich. He stated that there were abrasions on the victim's hip and elbow and that there were rope marks on her wrists and ankles. Her body was naked below the waist and was clothed in a beige blouse and a brassiere that was inside out. Detective Lieutenant Raymond Knuth, also of the Oscoda/AuSable Police Department, stated that the only identifiable fingerprints obtained from the residence where Helen Loyer's

body was found belonged to either the victim or defendant. Richard Bisbing, a civilian employee in the crime laboratory of the Michigan State Police, testified that a vaginal swab taken from the victim contained semen.

James Jacques, M.D., a physician in general practice and the medical examiner for Iosco County who pronounced the victim dead at 6:15 P.M. on May 9, 1978, stated that he observed marks around the victim's wrists and ankles indicating that they had been tied. He opined that the victim had been suffocated and had been dead for eight to twelve hours prior to when he saw her at 6:15 P.M. William DeYoung, M.D., a physician specializing in forensic pathology and who performed an autopsy on the victim on May 10, 1978, stated that he, too, observed the binding or rope marks on the victim's wrists and ankles and opined that the victim had been suffocated. His opinion was that the victim had been dead for six to twelve hours before 6:15 P.M. on the day of her death.

After the prosecution rested, defendant presented his proofs. Ronald Hines, M.D., a pathologist, after reviewing the victim's postmortem examination report, opined that an exact answer as to the time of the victim's death could not be given. Two of defendant's friends, Gary Cox and Cindy Cox, and defendant's sister, Brenda Forsythe, testified that defendant and the victim appeared to be happy together, that defendant's behavior did not indicate that he did not want his wife to join the Air Force, and that defendant never admitted to them any participation in the killing of the victim. John Kloss, with whom defendant lived for three weeks, stated that defendant told him that his wife had been killed by gunshot and that he had loved her. He also testi-

fied that prosecution witness Kevin Moors does not
have a very good reputation for honesty and truth-
fulness.

Finally, defendant testified in his own behalf. He
asserted that he had never tied up his wife, whom
he had married on Valentine's Day, 1977, and that
he thought it was "great" that she wanted to enter
the Air Force. On May 9, 1978, he stated, he went
to work in the morning and came home for lunch.
After eating lunch, he changed his shirt, told his
wife he loved her, kissed her, and returned to
work. After work, at 4:30 P.M., defendant came
home. However, since the door was locked and his
knocks went unanswered, he climbed through a
bedroom window. In the bedroom, his wife was
lying on the bed, motionless and without a pulse.
He then ran for help and asked a neighbor to
telephone the police. When the police were con-
tacted, he requested that they come to his resi-
dence because his wife "had been raped, robbed,
and murdered." He denied ever having told any-
one that he killed his wife and denied having
killed her.

On appeal, defendant raises four issues. First, he
argues that he was denied his right to compulsory
process by the trial court's refusal to compel cer-
tain out-of-state witnesses to attend the trial.

An accused in a criminal prosecution has the
right to compulsory process for obtaining witnesses
in his favor. US Const, Am VI. This right is
applicable to the states through the Fourteenth
Amendment. *Washington v Texas,* 388 US 14, 17-
18; 87 S Ct 1920; 18 L Ed 2d 1019 (1967). The
Michigan Constitution similarly guarantees an ac-
cused in a criminal prosecution the right to com-
pulsory process of witnesses in his favor. Const
1963, art 1, § 20. However, a criminal defendant's
right to compulsory process is not absolute, and

the constitution does not grant the right to sub-poena any and all witnesses a party might wish to call. *United States v Wilson*, 732 F2d 404, 412 (CA 5, 1984), cert den 469 US 1099; 105 S Ct 609; 83 L Ed 2d 718 (1984); *United States v Espinoza*, 641 F2d 153, 159 (CA 4, 1981), cert den 454 US 841; 102 S Ct 153; 70 L Ed 2d 125 (1981).

The uniform act to secure the attendance of witnesses from without a state in criminal proceedings provides, in pertinent part:

> If a person in a state, which by law provides for commanding persons within its borders to attend and testify in criminal prosecutions, or grand jury investigations commenced or about to commence, in this state, *is a material witness* in a prosecution pending in a court of record in this state, or in a grand jury investigation which has commenced or is about to commence, a judge of the court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required. The certificate may include a recommendation that the witness be taken into immediate custody and delivered to an officer of this state to assure his attendance in this state. This certificate shall be presented to a judge of a court of record in the county in which the witness is found. [Emphasis added. MCL 767.93(1); MSA 28.1023(193)(1).]

A trial court's decision under this statute is left to its discretion and will not be reversed absent an abuse of discretion. *People v Williams*, 114 Mich App 186, 201; 318 NW2d 671 (1982), lv den 422 Mich 909 (1985). In *Williams*, this Court commented on the issue of first impression in Michigan regarding the quantum of evidence required to invoke the statute:

> In *Lancaster v Green*, 175 Ohio St 203; 192

NE2d 776 (1963), defendant's petition requesting the attendance of witnesses did not specify the exact location of the witnesses. The court ruled that a defendant must be able, with a reasonable degree of certainty, not only to designate the witness but also the witness's exact location before the court would be required to initiate the complex judicial process required by the act. *Id.*, 205. Furthermore, the petition must be made in a timely manner. See *Commonwealth v Dirring*, 354 Mass 523; 238 NE2d 508 (1968). Finally, the defendant must make out a prima facie case that the witness's testimony is material. *Id.*, 526, *Commonwealth v Edgerly*, 6 Mass App 241; 375 NE2d 1 (1978). [114 Mich App 201.]

In this case, defendant contends that the trial court improperly refused to exercise its compulsory process powers regarding three individuals, namely, Marlene Mischley, Charles Newman, and Sharon Newman. We do not believe that defendant made out a prima facie case that the testimony of these individuals was "material." See 44 ALR2d 732, § 1, p 733. Accordingly, we affirm the decision of the trial court on this issue.

Defendant claimed that Marlene Mischley, who apparently lived in California at the time of the trial, was a material witness because she may have been in the presence of Stuart Popielarski and defendant when statements were made by defendant to Popielarski regarding the victim's death. Defendant also argued that Mischley could testify to Mr. Popielarski's credibility. As evidence of this, Mischley's statement to the police was introduced as an exhibit during the hearing on defendant's motion. Mischley's statement indicates that defendant never told her anything regarding the victim's death and that defendant spent time with Popielarski when Mischley was working. Mischley was, however, present when one Joyce

Perez asked defendant if there was anything that he had ever done that no one knew about. Defendant's response was that he had done something about which he would never tell anyone.

Thus, Mischley apparently knew nothing about the circumstances of the crime and never spoke to defendant about them. According to her police statement, she "did not know [defendant] for very long nor did she get to know him very well." The one conversation overheard by Mischley between defendant and Joyce Perez was not shown to have been made in the context of a discussion concerning the victim's death. Moreover, this information, if made in such a context, does not particularly favor · defendant. In addition, even 'if Mischley's testimony could bear on Popielarski's credibility, that alone does not elevate Mischley to the status of being a material witness for purposes of the relevant compulsory-process statute. Therefore, we conclude that the trial court did not abuse its discretion in refusing to compel the attendance of Marlene Mischley at defendant's trial.

Defendant also sought to compel the attendance of Charles Newman as a material, out-of-state witness. Mr. Newman and his wife, Sharon Newman, who apparently lived in Tennessee at the time of the trial, were neighbors of defendant on the date of the incident. Mr. Newman's statement to the police, which was admitted as an exhibit at the hearing, indicates that he thought he saw the victim standing in the window of her home on May 9, 1978, at approximately 11:20 A.M., although he was uncertain because he was "on a drunk." Defendant claims that this contradicts the prosecutor's theory that defendant killed the victim before he went to work in the morning. However, Mr. Newman was also contacted by the police on October 7, 1983, when he explained that

on May 9, 1978, he was at home between 7:00 A.M.
and 8:00 A.M. and then left for most of the day,
having gone out "bar-hopping" with his friends.
He explained that it could have been May 7 or 8,
1978, when he thought he saw the victim standing
in the window and that perhaps he did not see her
at all on the day of her death. Again, Mr. Newman
knew of no specific facts regarding the victim's
death and never conferred with defendant about
the event. Indeed, he could not, apparently, even
recall whether he saw the victim on the day of her
death. Under these circumstances, we cannot con-
clude that the trial court abused its discretion in
concluding that Mr. Newman was not a material
witness.

Finally, we also do not detect an abuse of discre-
tion in the trial court's refusal to compel the
attendance of Sharon Newman. She merely saw
defendant's car outside his home at lunch time on
May 9, 1978.

Second, defendant argues on appeal that the
trial court erred by permitting the prosecutor,
over defense objections, to elicit defendant's opin-
ion during cross-examination that certain prosecu-
tion witnesses were "liars." The prosecution, on
the other hand, argues that defendant himself
initiated this line of questioning during his direct
examination by specifically refuting the prosecu-
tion witnesses' testimony.

We reject the prosecution's argument that defen-
dant initiated this line of questioning. On direct
examination of defendant, defendant never re-
ferred to the prosecution witnesses as "liars," nor
did he give an opinion concerning the witnesses'
credibility. Rather, he simply denied that he had
told the witnesses the damaging statements they
said he had told them. Moreover, the Supreme
Court, in *People v Buckey,* 424 Mich 1, 17; 378

NW2d 432 (1985), has agreed with this Court that
it is improper for a prosecutor to ask a defendant
to comment on the credibility of prosecution wit-
nesses since a defendant's opinion on such a mat-
ter is not probative and credibility determinations
are to be made by the trier of fact. However,
although it was erroneous to permit the prosecutor
to question defendant in this case concerning his
assessment of the credibility of certain prosecution
witnesses, we find that the error is harmless. The
*Buckey* Court, in coming to a conclusion that a
similar error in that case was harmless, stated:

> This was not a case where the defendant might
> have been prejudiced by improper bolstering of the
> credibility of prosecution witnesses or by allowing
> an opinion on his guilt or credibility to be ex-
> pressed. Concededly, the prosecutor's strategy was
> to discredit defendant by inviting him to label
> prosecution witnesses "liars." However, the sub-
> stance of the exchange indicates that defendant
> dealt rather well with the questions. We fail to
> discern how he was harmed by the questions. [424
> Mich 17.]

Our review of the record discloses that, as with
the defendant in *Buckey,* the defendant in this
case "dealt rather well with the questions." When
asked whether each of seven prosecution witnesses
lied on the witness stand regarding whether defen-
dant had told them the statements they asserted
in court that he had told them, defendant was
adept at clarifying that the witnesses, if not lying,
at least had misunderstood him, had forgotten
what exactly defendant had actually said, or were
faulty in their recollection of the time at which
the purported statements were made. We note
that, in accordance with the discussion in *Buckey,*
the trial court in this case should have stopped

this line of questioning, given a cautionary instruction, and precluded comment about the matter by the prosecutor in his closing argument. 424 Mich 17-18. Nevertheless, in light of our perception of defendant's success in responding to the prosecutor's improper questions, we decline to deem the error harmful and thus cannot premise a reversal of defendant's conviction on this issue alone.

Third, defendant argues that he was improperly denied by the trial court a dismissal of the charge against him in view of the excessive lapse of time, being more than five years, between the reception of the evidence and the issuance of a complaint. Defendant asserts that this lengthy delay deprived him of due process. We disagree.

In *People v Hernandez,* 15 Mich App 141, 147; 170 NW2d 851 (1968), this Court enunciated a tripartite test to be applied in cases questioning whether a prearrest delay violated a defendant's right to procedural due process. Under that test, if the prosecution failed to establish any of the three prongs of the test, i.e., that the delay was not explainable, was deliberate, or resulted in undue prejudice to the defendant, then a due process violation was discernible. When the *Hernandez* test was reevaluated in *People v Bisard,* 114 Mich App 784; 319 NW2d 670 (1982), in light of federal court decisions issued after the release date of the *Hernandez* opinion, this Court adopted the following balancing test:

> [W]e hold that, once a defendant has shown some prejudice, the prosecution bears the burden of persuading the court that the reason for the delay is sufficient to justify whatever prejudice resulted. This approach places the burden of coming forward with evidence of prejudice on the defendant, who is most likely to have facts regarding prejudice at his disposal. The burden of persua-

sion rests with the state, which is most likely to have access to facts concerning the reasons for delay and which bears the responsibility for determining when an investigation should end. [114 Mich App 791.]

This balancing test has often been applied in post-*Bisard* cases. See, e.g., *People v Betancourt,* 120 Mich App 58, 63; 327 NW2d 390 (1982), lv den 417 Mich 874 (1983), *People v Evans,* 128 Mich App 311, 314; 340 NW2d 291 (1983), *People v Vargo,* 139 Mich App 573, 578-580; 362 NW2d 840 (1984), *People v Dungey,* 147 Mich App 83, 85-88; 383 NW2d 128 (1985), and *People v Shelson,* 150 Mich App 718, 726-727; 389 NW2d 159 (1986), lv den 426 Mich 862 (1986).

The offer of proof made by defendant in the trial court on this issue demonstrates that defendant failed to carry his burden to show some prejudice. Throughout the proceeding, defendant largely focused on the alleged inadequacy of the police investigation and not specifically on prejudice resulting from the prearrest delay. The primary reference to prejudice was made by a witness employed as a private investigator by the defense who testified that the "approximately eight witnesses" he had spoken to had "stated in one way or one fashion or another they could not remember the events I was asking them about." However, the particular events not remembered were not disclosed, the identities of the eight witnesses were not revealed, and no testimony regarding the nature of the alleged prejudice was adduced. The mere fact that a defense investigator spoke to several witnesses whose memories were not perfect concerning "the events that [he] was asking them about," whatever those events may have been, does not alone establish prejudice to a defendant on the issue of prearrest delay.

A defendant shoulders the burden of coming forward with evidence of prejudice. Until he does so, the prosecution's burden—to persuade the court that the delay was justified in the face of any resulting prejudice—is not triggered. The imperfection of a witness' memory may be exposed to the trier of fact during direct or cross-examination and may be emphasized to buttress or undermine credibility. If such absence of memory by a defendant's material witnesses due to a lengthy prearrest delay seriously impedes or significantly hinders a defendant in presenting his case, prejudice, of course, would be shown, and the prosecution would be required to demonstrate how that prejudice was justified by the prearrest delay. In this case, however, no such impediment or hindrance was manifest. Moreover, we decline to accept defendant's assertion on appeal that "the exceptionally long delay in the present case should itself raise a strong inference of prejudice." Without specific references to instances of prejudice-generating occurrences, and without specific allegations of actual prejudice resulting therefrom, the prosecution would be at an insuperable disadvantage indeed in attempting to show how such unspecified prejudice was in fact justified. We will not put the cart before the horse.

Finally, defendant argues that he was denied his constitutional right to equal protection by the required disclosure to the prosecution of the names of certain proposed witnesses and the substance of their expected testimony in order to secure payment of subpoena fees at the state's expense. In essence, defendant contends that the statute providing for the payment of subpoena and witness fees for an indigent defendant otherwise unable to pay such fees is unconstitutional. We agree.

The statute regarding payment of subpoena and witness fees for indigent defendants provides:

> If any person accused of any crime or misdemeanor, and about to be tried therefor in any court of record in this state, shall make it appear to the satisfaction of the judge presiding over the court wherein such trial is to be had, by his own oath, or otherwise, that there is a material witness in his favor within the jurisdiction of the court, without whose testimony he cannot safely proceed to a trial, giving the name and place of residence of such witness, and that such accused person is poor and has not and cannot obtain the means to procure the attendance of such witness at the place of trial, the judge in his discretion may, *at a time when the prosecuting officer of the county is present,* make an order that a subpoena be issued from such court for such witness in his favor, and that it be served by the proper officer of the court. And it shall be the duty of such officer to serve such subpoena, and of the witness or witnesses named therein to attend the trial, and the officer serving such subpoena shall be paid therefor, and the witness therein named shall be paid for attending such trial, in the same manner as if such witness or witnesses had been subpoenaed in behalf of the people. [Emphasis added. MCL 775.15; MSA 28.1252.]

Defendant filed a motion for approval of the issuance of subpoenas for defense witnesses without requiring disclosure of the witnesses' names or of their expected testimony. At a hearing conducted on the motion, the trial court refused defendant's request of nondisclosure after studying in camera a document prepared by defendant setting forth the names of nineteen proposed defense witnesses and the expected nature of their testimony. After the prosecutor was given a copy of defendant's document, he explained that he had

no objection to the witnesses' being subpoenaed by the court and to the state's being responsible for payment of fees, noting, "we do not want to create an issue on appeal as to whether or not the state interfered with the defendant's right to conduct his defense."

A defendant who is able to pay for service of process upon his witnesses and for their witness fees need not reveal, in the presence of "the prosecuting officer of the county," the number of witnesses he intends to call, the identities of the witnesses he intends to call, or the prospective testimony of the witnesses he intends to call. Nevertheless, a poor defendant who cannot obtain the means to procure the attendance of witnesses is forced to make such disclosures in order to establish their materiality to his case as required by the statute regarding payment of subpoena fees for indigent defendants. The constitutionality of that statute was questioned by this Court in *People v Thornton,* 80 Mich App 746, 752-573; 265 NW2d 35 (1978), in light of the analogous federal rule and federal cases. In dictum, the *Thornton* panel observed:

The Federal Rules of Criminal Procedure, Rule 17(b), formerly contained a provision very similar to the Michigan statute [MCL 775.15; MSA 28.1252] as interpreted by the judge in this case. The rule was amended in 1966 to allow defendants to apply for witness fees *ex parte, i.e.,* without revealing names and testimony to the prosecution. Cases commenting on the amendment indicate that the rule was changed because of the disturbing equal protection problem evident on the face of a rule which would require indigents to disclose their defense theory to the prosecution while not requiring similar disclosure from defendants who are able to pay their own fees. See *United States v Meriwether,* 486 F2d 498 (CA 5, 1973), *United*

*States v Barker,* 553 F2d 1013 (CA 6, 1977). For a
general discussion of the Federal rule and the
impetus behind the 1966 changes, see 1 Wright,
Federal Practice and Procedure (1969), Chapter 5,
§ 272, pp 539-544. These constitutional problems
could be avoided on retrial in the present case if
the trial judge accepts the defendant's offer to
submit the names of the witnesses and outlines of
their testimony for *in camera* inspection. This
procedure would be similar to the *ex parte* prac-
tice now followed in the Federal courts. [80 Mich
App 752-573.]

See also *United States v Brown,* 535 F2d 424, 428-
429 (CA 8, 1976), *Thor v United States,* 574 F2d
215, 221-222 (CA 5, 1978), and *United States v
Espinoza, supra,* 157-159.

The Michigan statute, like the pre-1966 federal
rule, subjects an indigent defendant's case to the
pretrial scrutiny of the prosecutor, thus poten-
tially exposing defendant's defense to prosecutorial
review when a monied defendant's defense would
remain inviolate. Clearly, the pretrial revelation of
the names, number, and expected testimony of a
defendant's witnesses might be of significant tacti-
cal advantage to the prosecution. First, as noted by
defendant, "It is simply a reflection of the truth
known by every litigator: the more known of the
opposing side's case, the better." Second, such
disclosure could lead the prosecution to emphasize
certain evidence in anticipation of contrary evi-
dence to be presented by defendant. Third, it could
lead the prosecution to deemphasize, or to omit,
certain evidence in anticipation of damaging im-
peachment evidence to be presented by defendant.
Moreover, it could help the prosecution during
voir dire and in structuring its opening statement.
Indeed, if the theory of a defendant's defense is
revealed to the prosecution prior to trial, it seems

likely that the prosecution could fashion its strategy as to best discredit and undermine that revealed defense. When such an advantage is to be reaped by the prosecution only when the defendant is poor and therefore cannot afford to pay the service-of-process and witness fees of his witnesses, it seems undeniable to us that such a defendant is not the recipient of equal justice under law. As declared in the landmark case of *Griffin v Illinois,* 351 US 12, 19; 76 S Ct 585; 100 L Ed 891 (1956): "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." A defendant's attempts, in the presence of a prosecuting officer, to establish the materiality of the witnesses he cannot afford to obtain for trial might very well make the prosecution privy to his defense. Thus, the quality of his defense, and hence the quality of his trial, depends upon the amount of money he has to pay service-of-process and witness fees. Accordingly, to the extent that the statute mandates that a poor defendant requesting the payment of service-of-process and witness fees for proposed defense witnesses must reveal, in the presence of the prosecution, the names and addresses of the witnesses, as well as why such witnesses are material to his cause, we hold that the defendant's constitutional right to equal protection is violated. The purpose of the statute is to protect public funds by assuring that no frivolous use of compulsory process by indigents occurs. This purpose, however, does not require the presence of the prosecution when a trial court decides whether an indigent defendant is entitled to payment of service-of-process and witness fees, and this is particularly the case when, in an attempt to establish such entitlement, the defendant is essentially forced to divulge the theory of his case prior to trial. We are confident that trial

judges alone serve as adequate safeguards against
the payment of state-paid subpoena fees for the
nonmaterial witnesses, or for the frivolous pur-
poses, of a poor defendant. Indigent defendants
should not be forced to obtain from the state the
payment of the subpoena-related fees of their wit-
nesses only at the price of their pretrial revelation
to the prosecution of anticipated trial strategy.

The error in this case which resulted from the
presence of the prosecutor at defendant's motion
for payment of service-of-process and witness fees
for his nineteen proposed witnesses, however, we
find to be harmless. The five witnesses, excluding
defendant himself, who testified during defendant's
case in chief were Ronald Hines, M.D.; Brenda
Forsythe; Cindy Cox; Gary Cox; and John Kloss. Of
these five, only the last three were listed in defen-
dant's proposed witness list of nineteen witnesses.
Of these three, Cindy Cox and Gary Cox were
listed as alibi witnesses in defendant's notice of
alibi filed prior to his motion for witness fees, and
had already been served. Thus, the only witness
whose name or testimony was perhaps not known
to the prosecution at the time of the motion for
subpoena fees and who testified at trial was John
Kloss, who was described in defendant's list of
nineteen witnesses as a character witness. Mr.
Kloss's testimony on direct examination fills little
more than one page of the voluminous trial tran-
script. He merely stated that defendant had lived
with him for three weeks, had told him that his
wife had been fatally shot, and that witness Kevin
Moors had a bad reputation for honesty and truth-
fulness. We fail to perceive, and on appeal defen-
dant fails to show us, how defendant was preju-
diced by the prosecution's foreknowledge merely of
Kloss's testimony. In addition, since none of the
other remaining witnesses on defendant's list ulti-

mately testified, we fail to perceive how the prosecution could have learned anything of value from the revelation of the information on the list. Indeed, if the prosecution shaped its case around the expected testimony of the remaining witnesses, defendant may have been benefited since those witnesses never in fact testified.

Having found no error requiring reversal on the issues raised by defendant on appeal, we affirm his conviction for the second-degree murder of his wife, Helen Ann Loyer, by means of suffocation.

Affirmed.

R. M. Maher, J., concurred.

T. K. Boyle, J. *(concurring in part and dissenting in part).* Defendant appeals from his conviction for second-degree murder, and the majority affirms his conviction. I concur. The majority, however, purportedly declares a state statute unconstitutional, but holds that the error involved in applying the statute was harmless. I disagree that the statute is unconstitutional, but I concur in the result because I deem such declaration dicta in light of the holding of the majority.

I disagree with the majority's declaration of unconstitutionality for several reasons. First, the application of the Equal Protection Clause to the statute is seriously flawed.

Second, the articulation of the disadvantage suffered by defendant, the loss of his right to trial by ambush or surprise, is a curious interpretation of equal protection at best and a perverse interpretation at worst. In the proper case, with the issue squarely before us, I would support a trial judge's authority to require discovery from the defense with or without a statute.

Third, the majority factually errs in assuming

that MCL 775.15; MSA 28.1252, is the only means by which indigent defendants may obtain payment of subpoena and witness fees for their witnesses.

Finally, this state's proud history of providing counsel, transcripts, witness fees, and other services for indigents, long before such terms were constitutionally compelled, is simply overlooked. MCL 775.15; MSA 28.1252 is one part of a broader statutory scheme, with a history dating at least to 1927, in which this state ordered services for indigent defendants. It seems inappropriate to condemn as "invidiously discriminatory" that which was clearly intended to provide a benefit for indigents.

Before these four specific points are addressed, a few general observations on the record in this case should be noted. The trial judge supplied defendant with approximately all he requested. Virtually open file discovery from the state was ordered. The trial judge ordered the taking of depositions from nine witnesses. The state police were involved in assisting the defense prior to the hearing giving rise to the claim of error. In my opinion, the record, properly characterized, supports the conclusion that defendant was in fact attempting to shift to the state the responsibility of locating and transporting the witnesses in question to the court for trial.

In other words, the burden of production and the responsibility for nonproduction of these witnesses under current Michigan law at the time of trial was being shifted to the state. It is difficult to understand how the state can be responsible for locating a witness, the identity of whom is not revealed.

On the record of the hearing, defense counsel specifically requested the use of the Secretary of State's records, LEIN records, and whatever other

computer-assisted means were available to locate the missing witnesses. Moreover, MCL 775.15; MSA 28.1252, in its own terms, does not require the defendant or defense counsel to reveal the testimony of proposed witnesses. Further, the statute provides for the presence of the prosecutor *when* the trial judge issues his order, not necessarily when defendant's showing of need is made.

Finally, as to preliminary matters, the majority states that the purpose of the statute is to protect public funds by assuring that no frivolous use of compulsory process by indigents occurs. That is one purpose of the statute. A second purpose is to insure that the county's or state's chief law enforcement officer, the prosecuting attorney or Attorney General, respectively, is aware of his or her obligation to require state or county agents to use due diligence to locate and produce the witnesses.

The majority also reasons as though the statutorily created res gestae witness rule with its judicially created interpretation did not exist. At the time of this trial, under Michigan case law, a failure to locate and produce an approved witness might well be excused only by a showing of due diligence.

While these points may be regarded as minor, they set the tone for the analysis of the four major issues as I see them.

### I. EQUAL PROTECTION

It may seem undeniable to the majority that a defendant who is required to identify witnesses and make a showing of need in order to shift to the state the responsibility for locating and producing them is denied equal protection of the law, but, if it is so, more authority for that legal conclusion than *Griffin v Illinois,* 351 US 12; 76 S

Ct 585; 100 L Ed 891 (1956), is necessary. With one quote, "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has," 351 US 19, the majority declares the statute unconstitutional.

The majority appears to suggest that whatever advantage a defendant may obtain by adequate funding, the state must supply to the indigent defendant. That has never been the law, federally or in Michigan, and there is not a single case the majority can cite in Michigan and in the United States Supreme Court which so holds.

Given the limited holding of the majority, a lengthy recitation of "equality principle" cases is not justified. Let it suffice to point out some obvious limitations on the principle.

Compare *Douglas v California,* 372 US 353; 83 S Ct 814; 9 L ED 2d 811 (1963) (right to appointed counsel on first appeal of right), with *Ross v Moffitt,* 417 US 600; 94 S Ct 2437; 41 L Ed 2d 341 (1974) (no right to appointed counsel on discretionary appeal to State Supreme Court).

Compare *Gideon v Wainwright,* 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963) (right to appointed counsel at trial), with *Argersinger v Hamlin,* 407 US 25; 92 S Ct 2006; 32 L Ed 2d 530 (1972) (right to appointed counsel at misdemeanor trial if incarceration is imposed as a penalty), and *Scott v Illinois,* 440 US 367; 99 S Ct 1158; 59 L Ed 2d 383 (1979) (no right to appointed counsel for trial of offense with maximum penalty of one year if punishment of incarceration has not been imposed).

Compare *Griffin v Illinois, supra* (right to transcript at state expense), with *United States v MacCollom,* 426 US 317; 96 S Ct 2086; 48 L Ed 2d 666 (1976) (denial of trial transcript for a collateral review is proper unless defendant makes a show-

ing that the claim is not frivolous and that the transcript is needed).

The more recent cases argued before the United States Supreme Court on an equal protection claim have been decided by an analysis sounding in due process.

In *Bearden v Georgia,* 461 US 660; 103 S CT 2064; 76 L Ed 2d 221 (1983) (wherein the Court holds that it is error to automatically revoke probation because the defendant could not pay his fine absent a determination that the defendant failed to make bona fide efforts to pay or that adequate alternative forms of punishment did not exist), the Court cites the *Douglas-Griffin* line of cases and opts for a due process analysis of the issue, stating:

> Whether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . . ." [461 US 666-667.]

Again, in *Ake v Oklahoma,* 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985), wherein the Court held that, once a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the federal constitution requires that a state provide access to a psychiatrist's assistance on the issue if the defendant is indigent (death penalty case), the Court discussed the *Griffin-Douglas* line of cases and stated that the common theme is meaningful access to justice, an adequate opportunity to present claims fairly within the adversary system, and

the provision of the basic tools of an adequate defense. The Court announced a three-factor standard for analysis:

> The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. [470 US 77.]

The Court, in ruling, rested squarely on due process and declined to consider the applicability of the equal protection clause. 470 US 86-87.

Under the first factor of the *Ake* test, the private interest is the defendant's strategic and tactical advantage in surprise. The majority treats as a judicially cognizable interest the defendant's advantage in trial by ambush.

With regard to the second factor, the governmental interest is economy as well as defending against claims of failure of due diligence.

The third factor is inapposite on the facts of this case, a suggestion that pigeonholing this case into equal protection or due process analysis is probably incorrect. The obvious claim more readily available is the right to compulsory process already expressed in the Bill of Rights. See Westen, Compulsory Process II, 74 Mich L Rev 191, 268-271 (1975). However, case law under such analysis will not support the majority's finding of unconstitutionality.

Under *Bearden,* the analysis is similar. The individual interest is the defendant's right to surprise, and the governmental interest is as indicated above.

The point of all this is to demonstrate that equal

protection analysis simply will not support an application of the doctrine to the facts of this case. It is clear that in both *Ake* and *Bearden,* the test articulated is a classic due process balancing test. Just as clearly the articulation of a private or individual interest alone does not suffice. That interest or right must be legitimate in order to invoke a due process (or equal protection) analysis. See *United States v Kahan,* 415 US 239; 94 S Ct 1179; 39 L Ed 2d 297 (1974) (defendant's pretrial false statements concerning indigency in seeking appointment of counsel used by government during the trial as evidence of consciousness of guilt; and, against a claim of violation of the Fifth Amendment's self-incrimination clause and Sixth Amendment's right to counsel clause, the majority refused to judicially recognize a right to lie with impunity). I would hold, simply, that defendant had no judicially cognizable claim to trial by surprise or ambush.

Moreover, the majority alludes to the change in the Federal Rules of Criminal Procedure to provide for an ex parte application on facts similar to our facts. In *United States v Eskridge,* 456 F2d 1202 (CA 9, 1972), cert den 409 US 883 (1972), a federal trial judge ordered the FBI to secure statements from the defense witnesses listed prior to granting the application. The witnesses were cross-examined at trial by the government with use of their statements. The ninth circuit held that the error, if any, was harmless because of the absence of a showing of prejudice or that defendant's substantial rights were in any way affected by that process.

*Eskridge* occurs in a federal system wherein discovery is still largely a matter of governmental grace as compared to the system in the state which provides in large part for virtually open-file

discovery and, until recently, had a res gestae witness rule, unique in the legal universe, which required the state to endorse and produce all witnesses to any element of the offense, or, as alternatively stated by some opinions, necessary to provide the whole of the transaction *and* to prevent any false charge or miscarriage of justice. 1A Gillespie, Michigan Criminal Law & Procedure (2d ed), § 343, p 111.

Finally, it is clear that a defendant can be required to make a showing of particularized need in order to support his request for the production of witnesses, Westen, *supra,* p 266.

## II. THE TRIAL JUDICIARY

Our Supreme Court, in *People v Maranian,* 359 Mich 361, 368; 102 NW2d 568 (1960), stated:

> Discovery will be ordered in all criminal cases, when, in the sound discretion of the trial judge, the thing to be inspected is admissible in evidence and a failure of justice may result from its suppression.

Further, in *People v Johnson,* 356 Mich 619, 628; 97 NW2d 739 (1959), the Court stated:

> We are aware, of course, that appellant's claim in the instant case is founded upon *no* Michigan rule or statute. We believe the discretion we speak of [to compel discovery] is found in the *inherent power of the trial court* to control the admission of evidence so as to promote the interests of justice. [Emphasis added.]

There is simply no principled analysis by which such trial court discretion and inherent power can be limited to be of service only to the defendant.

A committee appointed by the Michigan Supreme Court has worked for several years in the formulation of proposed rules of criminal procedure. Those rules have been published and are before the Supreme Court for adoption. Subchapter 6.200 deals with discovery, and rules 6.201 through 6.214 basically provide for virtual open-file discovery for the defense and a broad form of discovery for the prosecution.

In my view, there is no reasonable argument that can be made against granting the state all discovery not prohibited by the United States Constitution. The proposed rules fall short under such standard, but they are a reasonable accommodation of competing interests. Proposed MCR 6.205 would cover the facts of the instant case and make all information supplied by defendant in this case a subject of mandatory disclosure.

Clearly no constitutional right is implicated in requiring such disclosure. See, in general, *Williams v Florida,* 399 US 78; 90 S Ct 1893; 26 L Ed 2d 446 (1970), *United States v Nobles,* 422 US 225; 95 S Ct 2160; 45 L Ed 2d 141 (1975), *Fisher v United States,* 425 US 391; 96 S Ct 1569; 48 L Ed 2d 39 (1976), and *United States v Doe,* 465 US 605; 104 S Ct 1237; 79 L Ed 2d 552 (1984).

The primary purpose for the criminal trial is the search for truth. Accuracy in fact-finding is critical. Fairness is an objective, as well, along with the timely, expeditious disposition of cases. The avoidance of surprise is a factor.

The creation of rules to insure that the judicial system in its handling of criminal cases assures that all these objectives are most likely to be realized is an advance in criminal justice. A system of reciprocal discovery which facilitates the full presentation of all material factual and legal claims in an expeditious manner while according

the defendant all that fundamental fairness requires and more likely leads to the fair ascertainment of truth cannot be opposed on the basis of any rational principle known to this writer.

The argument opposed is well articulated in the majority opinion. The majority apparently believes in the sporting theory of justice—that a defendant ought to be given a fair opportunity to beat the case even if he can do this only by surprise or ambush.

Clearly, the United States Constitution does not require this result. Why should it be the policy of this state?

In *Taylor v Illinois,* 484 US —; 108 S Ct 646; 98 L Ed 2d 798 (1988), the United States Supreme Court ruled that the preclusion of the testimony of a defense witness on the grounds of a violation of the discovery order was not a violation of the right of compulsory process at least where the discovery violation was wilful and motivated by the desire to obtain a tactical advantage that would minimize effectiveness of cross-examination and the ability to adduce rebuttal evidence. The Court stated:

> The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence; the interest in the fair and efficient administration of justice; and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance . . . .
>
> *     *     *
>
> After all, the court, as well as the prosecutor, has a vital interest in protecting the trial process from the pollution of perjured testimony. [108 S Ct 655-657.]

The Court was unanimous in approving discov-

ery for the prosecution. A three-justice dissent, authored by Justice Brennan, would hold that

> absent evidence of defendant's personal involvement in a discovery violation, the Compulsory Process Clause *per se* bars discovery sanctions that exclude criminal defense evidence. [108 S Ct 658.]

The flaw of the majority opinion in this case is the legitimization of surprise. Surprise, in fact, may offer a strategic or tactical advantage, but it ought not be recognized as legitimate in any enlightened system of jurisprudence. Surprise used to perpetrate a lie on an unprepared adversary ought to be condemned as a practice, and trial courts have, or ought to have, the inherent power to prevent it.

To base a claim of equal protection upon the refusal to allow an indigent defendant to surprise his adversary simply because a person of means might be able to do so is an insult to the constitution. The gravamen of the argument is that there is a judicially cognizable right to trial by ambush. I would not so hold, and no case from this state or from the United States Supreme Court ever has.

### III. MCL 775.15; MSA 28.1252—THE STATUTORY SCHEME

The majority treats MCL 775.15; MSA 28.1252 as the exclusive means by which an indigent defendant can procure state payment of subpoena and witness fees. This is simply factually incorrect. MCL 767.32; MSA 28.972 provides:

> The clerk of any county in which an indictment shall be found, upon the application of the defendant, and without requiring any fees, shall issue subpoenas as well during the sitting of any court as in vacation, for such witnesses as the defendant

may require, whether residing in or out of the county.

MCL 775.15; MSA 28.1252 and MCL 767.32; MSA 28.972 have existed simultaneously in the compiled laws since 1929. Both statutes have legislative forerunners at least as old as 1897.

As long ago as 1908, our Michigan Supreme Court interpreted the statute to require that service and witness fees, as well as mileage, need not be paid in advance in criminal cases, but only after trial. *Chase v Kalamazoo Circuit Judge,* 154 Mich 271; 117 NW 660 (1908).

Clearly, relief for an indigent from the costs of service and witness fees is obtainable without any required disclosure at all.

The proper interpretation of MCL 775.15; MSA 28.1252 would be that it has several purposes, the safeguarding of the treasury being only one. The statute contemplates the shifting of the responsibility for location and service of witnesses onto the state, even though such witnesses are not res gestae witnesses under the old law. There is a clearly legitimate state objective in requiring the court to issue the order for service in the presence of the prosecuting attorney since such officer, under the law in existence until recently, would bear the burden of production in court or be required to explain nonproduction by a standard of due diligence.

Such a contest about burdens and responsibilities was exactly what was being debated at the pretrial hearing.

### IV. MICHIGAN HISTORY

Before the United States Supreme Court recognized the right to counsel as fundamental, *Powell*

*v Alabama,* 287 US 45; 53 S Ct 55; 77 L Ed 158
(1932) (at least in death penalty cases with special
circumstances), and guaranteed it in federal trials,
*Johnson v Zerbst,* 304 US 458; 58 S Ct 1019; 82 L
Ed 1461 (1938), and later denied it as a fundamen-
tal part of due process, *Betts v Brady,* 316 US 455;
62 S Ct 1252; 86 L Ed 1595 (1942) (only overruled
by *Gideon, supra,* in 1963), the state legislature
had provided for such right in Michigan. MCL
775.16; MSA 28.1253, and see 1927 PA 175.

Judges in this state were appointing lawyers for
indigent defendants charged with serious felonies
as early as 1850, see *Bacon v Wayne Co,* 1 Mich
461 (1850).

The clear legislative forerunner for MCL 775.16;
MSA 28.1253 dates back at least to 1893 PA 96,
authorizing trial judges to appoint counsel in fel-
ony cases and fixing the compensation.

Michigan does not stand out only for appoint-
ment of counsel for indigents. It was the first
jurisdiction in the world to prohibit the death
penalty. It occupied a unique position in its res
gestae witness rule rejected by all other jurisdic-
tions. 7 Wigmore, Evidence (Chadbourn rev),
§§ 2079-2080 pp 536-544; 23 CJS, Criminal Law,
§ 1017, p 1094. Without regard to the wisdom in
these and other policies, it appears clear that this
state, through its constitution, its Legislature, and
its courts, has always adopted an extremely sensi-
tive approach to the rights of criminal defendants
in general and indigent defendants in particular.

There is no justification for declaring unconstitu-
tional a statute intended to facilitate services for
indigent defendants at least on the basis of the
record in this case.

### V. SUMMARY

There is no authority to support the majority's

finding that MCL 775.15; MSA 28.1252 is unconstitutional. Moreover, the disadvantage allegedly suffered by defendant, the inability to surprise the state with his unidentified witnesses, is not a judicially cognizable right subject to equal protection.

In my opinion, the trial judiciary in this state has inherent power to order discovery in favor of the state so long as neither the Constitution of the United States nor the State of Michigan is offended. The action of the trial judge would have been proper without the authorization of MCL 775.15; MSA 28.1252.

A system of reciprocal discovery which facilitates the full presentation of all material factual and legal claims in an expeditious manner while according the defendant all that fundamental fairness requires and more likely leads to the fair ascertainment of truth and the prevention of perjury and surprise, if it is not presently the judicial policy of the State of Michigan, ought to be so.

Parallel provisions in the law, such as the clerk's statute, make the claim of unconstitutionality frivolous. There simply is nothing in this particular statute, the statutory scheme of which it is a part, or the history of recognition of equal protection rights for indigent defendants in this state which justifies the majority's opinion today.

The trial judge's interpretation and application of MCL 775.15; MSA 28.1252 was not erroneous.